W. Willard WIRTZ, Secretary of Labor,
United States Department of Labor,
Plaintiff,

v.

WHEATON GLASS CO., a Corporation,
Defendant.

Civ. A. No. 53–66.

United States District Court
D. New Jersey.

May 1, 1968.

See also D.C., 253 F.Supp. 93.

Charles Donahue, Solicitor and John A. Hughes, Regional Atty., Dept. of Labor, and Francis V. LaRuffa, Mary E. Cerbone, Anastasia T. Dunau, Attys., Dept. of Labor, for plaintiff.

Joseph B. Kauffman, Atlantic City, N. J., Dilworth, Paxson, Kalish, Kohn & Levy, Philadelphia, Pa., by Harold E. Kohn, Bruce W. Kauffman, David Pittinsky, Philadelphia, Pa., for defendant; Marcus Manoff, Philadelphia, Pa., of counsel.

## OPINION

COHEN, District Judge:

The plaintiff, W. Willard Wirtz, Secretary of the United States Department of Labor, commenced this action under Section 17 of the Fair Labor Standards Act of 1938, as amended,[1] and supplemented by the Equal Pay Act of 1963,[2] against defendant Wheaton Glass Co., a New Jersey corporation, seeking to enjoin it from allegedly violating the equal pay provisions of the latter Act. The gravamen of the complaint is that defendant is violating the Act by maintaining a wage rate disparity based upon *sex discrimination* between the male and female employees in its glass container inspecting and packaging department, in Millville, New Jersey. Restraint is sought, also, against the withholding of any back wages found to be due by reason of such alleged violation.[3]

Plaintiff alleges that the defendant violates the Act by discriminating between men and women in the position of "selector-packer" of its glass bottle products on the basis of sex. He complains that in this job men and women perform equal work under similar working conditions, but receive unequal pay.

While the defendant admits that the employees involved are covered by the Fair Labor Standards Act, it denies any violation thereof. It contends that the trial testimony amply demonstrates substantial differences in performance between the male and female selector-packers; accordingly, not only has the plaintiff failed to carry his required burden of establishing *sex* as the basis for the hourly wage differential of 21½ cents ($2.355 for males and $2.14 for females), but that he has also failed in his burden of foreclosing "any other factor other than sex" as a basis for the wage differential.

The factual dispute between the parties involves the question of how much, if any, of the work performed by male selector-packers differs substantially from that performed by the females. There is disagreement as well on the legal meaning to be attributed judicially to the phrase "equal work" as used in the Act, and whether the defendant's wage rate differential is based upon a factor or factors other than sex, as provided by the *exceptive* language of

---

1. 29 U.S.C. § 201 et seq.

2. 29 U.S.C. § 206(d) (1), Pub.L. 88–38, § 3, 77 Stat. 56, provides:
   "No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex, by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex: *Provided*, That an employer who is paying a wage rate differential in violation of this subsection shall not, in order to comply with the provisions of this subsection, reduce the wage rate of any employee."

3. Section 206(d) (3) provides as follows:
   "For purposes of administration and enforcement, any amounts owing to any employee which have been withheld in violation of this subsection shall be deemed to be unpaid minimum wages or unpaid overtime compensation under this chapter."

the Act.[4] Substantially, such are the contentions of the parties.

Plaintiff's approach to these issues is that, as to the burden of proof under the Act, he is not required to prove that sex is the *sole* basis for the wage differential, for the word "sole" is used nowhere in the Act. Furthermore, if the plaintiff is to be confined to proof of sex as the *sole* factor, an employer could handily subvert the equal pay provisions by any ingenious increment of job duties. He recognizes that while the Act provides *exceptions,* these are directed to systems, patterns or distinctive classifications, such as seniority, merit, quantity or quality of product,[4] and not to self-serving, unrealistic, unsubstantial or inconsequential incidents in prime job content and performance. The plaintiff maintains that the intention of Congress was not to afford an employer opportunity to continue a wage differential based on sex simply by utilizing artificial classification or guise on the pretense of complying with the Equal Pay Act. He contends that the legislative history of the Act, together with the departmental regulations promulgated thereafter, as well as the decisions construing them, support his position. He stresses the fact that *occasional* performance by males of *other tasks* enumerated herein, which are merely incidental to the overall job cycle, and for which females may be inadequate, as well as *other factors* relied upon by the defendant, hereinafter, are not such bases under the Act, as will convert otherwise equal work into unequal. If not so, he argues, the equality in wage treatment of both sexes expressly sought to be accomplished by Congress could be defeated by the merest pretense of performance differences between the sexes.

Defendant, in advancing justification both factually and legally for the wage rate differential between men and women, claims that the proofs at trial clearly establish essential and substantial differences in job performance; and that these differences are not based upon sex, nor devised to secure an economic advantage. Rather, they are necessary and proper, since the complete job cycle and content of its *unique* business demand a realistic distinction in *job performance requirements* and, thus, justify the difference in wage treatment.

In light of the diametrically opposed factual and legal contentions of the parties, a history of the defendant's operations and an analysis of the trial proofs seem essential both for judicial choice of fact, as well as for interpretation and application of the law.

The trial consumed 16 non-consecutive days, prior to which I visited the defendant's plant in order to gain some familiarity with the technical aspects of the job performed by the selector-packers. A similar visit was made at the conclusion of the trial, in order to correlate the testimony to the visual operation.

Defendant is one of the largest manufacturers of glass containers in this Country. Its principal plant occupies an area approximating several metropolitan city blocks. It carries an hourly rate employee payroll, as distinguished from administrative and salaried, annually approximating eleven and a half million dollars. It engages some 2,200 hourly employees who are represented in collective bargaining by the Glass Bottle Blowers Association of the United States and Canada, AFL–CIO, Local 219. For the purposes of this case, however, we need not attempt exposition of all the facets of the defendant's operation nor of the duties of all its employees. It will suffice to state that the two principal components of the defendant's plant are the "hot end," furnaces where the glassware is manufactured, and the "cold end" where it is inspected, selected and packaged. Our concern is solely with a category of employees denominated by the defendant as "selector-packers" located in the "cold end."

It is at the emission point, where the bottles, jars and other containers leave

4. 29 U.S.C. § 206(d) (1) (iv), ibid n. 2.

the "hot end" on a lehr [5] and move forward on its conveyor belt to the "cold end," that the selector-packers are engaged. It is here, on a long, wide conveyor table, the belt of which moves at the approximate rate of 14 inches per minute past the male and female selector-packers, that containers are picked up by hand and visually inspected for defects. Defective bottles (cullet) are rejected and discarded into a waste container. Those selected are packed in cardboard cartons on a "buck," or stand, within arm's reach and lifted onto an adjacent conveyor, or stacked aside, for removal to the Quality Control or Inspection Department.

In addition to the selector-packers, the defendant employs, in its packing department, some 37 base rate employees known as "snap-up" boys, who receive $2.16 per hour, 2 cents more than the females. Their function is that of the all-around "handy man." They act as relief selector-packers during the lunch period and other "breaks," so that the lehr is continuously manned to sustain its output and to prevent spillage and breakage. They also lift heavy or bulky cartons for women and perform whatever miscellaneous physical labor may be required of them on a given job at a particular time. Their higher rate is not challenged.

In addition to selecting and packing, along with females at the lehr, other duties of the male selector-packers are as follows: (1) to lift anything weighing approximately in excess of 35 pounds; (2) to lift any bulky or unhandy cartons, regardless of weight; (3) to stack full cartons on wooden pallets, a process known in the trade as "palletizing," in the area of the related lehr; (4) to tie securely stacks of cartons on the pallets; (5) to move and place fully loaded pallets for further disposition; (6) to carry, move, place and stack empty pallets for later use; (7) to operate hand trucks in the areas of the lehrs; (8) to carry, move, position, install, set-up and adjust portable roller conveyors and packing "bucks" (waist high stands or racks positioned next to the moving conveyor, which hold empty cartons for filling); (9) to collect, carry and dump trays and tubs of cullet (rejected glassware); (10) to sweep and clean all work areas in and around the aisles near the lehrs, and to prepare for job changes; (11) to cut glass stoppers with a diamond saw at the lehrs; (12) to fit and attach metal clips to glass containers at the lehrs; (13) to unjam overhead carton conveyors and automatic cullet belts; (14) to occasionally reinspect, repack and restack delivered glassware on customers' premises; (15) to locate certain glassware in defendant's warehouse, which at times may involve climbing over stacks of palletized ware; and (16) to work, if necessary, in excess of 10 hours in any one work day and in excess of 54 hours in any one work week.[6]

The females perform little or none of the foregoing duties. As of October 1, 1967, they were 230 in number.

Such then, in general outline, is the factual picture of the operations of the department in question, as well as some of the more specific duties of the selector-packers, as established by the testimony. In the development of its case, plaintiff presented 33 witnesses, among whom were 25 females and, out of a complement of 276, only 5 male selector-packers. Of the latter group, one is the husband of a female selector-packer; another is a union shop steward, admittedly seeking wage upgrading for the females; and two other males who were briefly employed by defendant, but who at the time of trial were no longer so employed.

5. A "lehr" is a long oven or furnace on which glassware is annealed (heated, then cooled, or tempered) as it travels through on a continuous belt.

6. A "double shift" refers to 2 consecutive tours of duty—sixteen hours or any portion thereof over 10 hours. From January 1, 1966 through September 30, 1967, there were 2,952 instances when men worked "double shifts" which women, under New Jersey Law, are prohibited from doing. See n. 14, post.

In turn, the defendant presented six witnesses, most of whom represented management personnel.

It should be observed, particularly in a non-jury case, that the crucial issue of credibility requires careful scrutiny, analysis and assessment of the testimony of each and every witness. In doing so, it seems obvious that those witnesses presented by the plaintiff, of necessity, understandably provided a limited view, circumscribed by their time and work areas, while those of the defendant presented a broader view of the overall scope of the operation of the entire department. Furthermore, it may be mentioned that the tempering influence of self-interest, as it might understandably affect each witness, has been taken into consideration.

Further examination of the evidence reveals that prior to 1956, the Bottle Inspection Department was staffed solely by male employees, consisting of selector-packers and "snap-up" boys who performed the total job. The advent in 1956 of the distaff side of this department was precipitated by a precarious local labor market, upon which the defendant was and is totally dependent. The shortage of available men in the Millville labor area [7] required the defendant to resort, for the first time, to the employment of females as an adjunct to its depleted male labor force. At this time, the Union adopted the position that a new job must be created for females different from that of males. It was to be confined to light-duty work, comparable to other light duty provided for female employees throughout the defendant's plant. A further condition was that no bulky or heavy lifting of any carton over 35 pounds [8] was to be permitted, and that no male selector-packer was to be displaced by a female, except to fill a vacancy resulting from death or resignation. The parties agreed and, accordingly, there was carved out of the total job of selector-packer, a segment heretofore performed exclusively by the male; then there was created a new role of female selector-packer to whom there was assigned lighter duties at the lehr, consisting solely of selecting and packing. So that the total job in the Bottle Inspection Department was thereupon divided into three segments: one, that of the versatile male selector-packer; two, that of the female performing light duty and three, that of the "snap-up" boy performing miscellaneous labor. While it is true that some of the duties performed by the male selector-packers can be and are performed by the "snap-up" boys, nevertheless, the defendant must use its male selector-packers as well for these duties as a matter of operational and economic necessity, in order that the limited performance of the females may be supplemented to complete the total job cycle. Consistent with economy, it would be unreasonable to insist that the defendant should add to and maintain otherwise idle base rate men to perform all duties (other than selecting and packing), as occasions demand and as presently performed by male selector-packers.

Turning now to the wage differential itself, we find that at the time of the creation of the job of female selector-packer in 1956, both the defendant and the union agreed upon a 10 percent differential rate between the men and the women. In so doing, the parties took into consideration the limitations of effort, knowledge, skill and responsibility of the new job, as well as comparable

7. We are not here confonted with a large metropolitan community. Rather, a small rural area with a county population of about 100,000, of which the City of Millville has 20,000. New Jersey Legislative Manual, 1967.

8. From January 1964 to September 1967, the percentage of jobs in excess of 35 lbs. was 30.6 and 85.6 percent of the cartons weighing over 35 lbs., weighed over 40 lbs. 186,000 cartons are used on a weekly average. 200 cartons in excess of 35 lbs. are lifted on an average by each man each week. There was some testimony that some females lifted more than 35 lbs. on occasion and that they did not clearly understand that there was a rule.

jobs throughout the plant, community and industry. As with the male selector-packers and the supporting "snap-up" boys, no precise job evaluation enumerating duties was ever established as to this particular job. It was determined by the parties to be only part of an existing job. The wage rate for the female continued to be, and still is, 10 percent below that set for the male. When the 1962–65 labor contract was approaching the end of its term, and renewal negotiations were in progress between the defendant and the union, the question of the wage differential came into focus in light of the interim passage of the Equal Pay Act, the provisions of which did not apply to the defendant until the 1962–65 labor agreement expired. Not once, during all the bargaining negotiations since the 1956 employment of female selector-packers, did the difference in wages become a collective bargaining issue. On the contrary, the 10 percent differential was accepted by the females through their union bargaining representatives without question and did not rear its head until after the passage of the *Act,* when it was raised for the first time during the course of a political campaign for the election of the union president. Rather significantly, there was testimony from which it may be deduced that the status was accepted, i. e., light duty and corresponding wage were acquiesced in by all the parties to the labor agreement. A union representative admitted that he complained to defendant, when a female selector-packer was allegedly assigned to perform duties involving cullet removal, heavy lifting and cleaning around the lehr, protesting that this was work for which she was not employed.

Defendant continued to employ women in the Bottling Department but, because of their limited utility, not to its entire satisfaction. It became evident that by reason of its dependence upon males for the performance of the total job cycle, and not merely for some supposed economic advantage, the existing employment of females did not provide the requisite flexibility, so crucially essential to its singular operation. Just as soon as the labor market permitted, hiring reverted solely to males, although women were abundantly available and it would have been economically more feasible to employ them, especially since their wage rate was 10 percent lower than that of the men. The uncontradicted testimony presented by the defendant was that not one female was hired between August 12, 1962 and May 12, 1966, a period of almost four years, during which time 1,279 males were hired. This fact significantly and realistically substantiates the theory posited by defendant that the element of flexibility in the intelligent use of its labor force has always been the key to the efficient functioning of its unique industrial plant. And it is strongly corroborative of the rationale advanced, that defendant is almost completely dependent upon use of the more versatile males in its selecting and packing department, not as a preference alone but, rather, as a matter of sheer economic necessity and sound industrial management. Further illustration of such dependence upon the ever shifting local labor pool is the fact that defendant was compelled to resort to the employment of females once again in May, 1966, when the male labor market had been exhausted. So, also, is the labor problem pointed up in an industrial enterprise of this magnitude by defendant's Summer employment of untrained college students, who were and still are phased into its operations as a temporary aid in meeting its ever present need for job flexibility. While it is true that to some extent, all employers are dependent upon the supply of labor, be it male or female, be it for reasons of geography or season, nevertheless, that is not to say that all employees, irrespective of sex, can fulfill all the requirements of certain industrial jobs of a particular employer.

Outstanding, among all the witnesses, was Thomas B. Hinckley, Jr., the defendant's General Factories Manager. He provided not only factual testimony but, based upon his exceptional background,

broad training and extensive experience, profound expertise regarding the established standards, customs and practices of the time-honored glass container industry, so rich in its early history of individual glass blowing and down to the modern assembly line. Hinckley has been in the glass container business for forty years with vast experience both in its production and management phases and reached his present position with the defendant company, literally arising from the ranks.[9] He is truly one of the giants of the industry and seldom has this Court had the benefit of such expert and credible testimony. He provided great insight into the singularity of the defendant's operation which he termed "unique," in that it has to be tailored to fit the diversified demands made by its market. This necessitates manual handling and visual inspection at the lehrs, in contrast to the use of automatic inspection, selection and packaging machinery by the modern glass industry. The latter is principally engaged in the manufacture of standard items, such as pharmaceutical, cosmetic, mayonnaise, peanut butter, and baby food jars, and beer, soda, and milk bottles, and the like, requiring little or no change in size, color, design, quantity or quality. The defendant's plant is the only one in the industry capable of manufacturing customized products of nine different sizes,[10] types and colors within twenty-four hours of a customer's order, a feat unmatched by any other company in the United States.

Thus, distinction must be drawn between a "job shop," such as the defendant's, and standard plants where automatic equipment makes possible the exclusive employment of women as selector-packers. Because of the defendant's peculiar operations, it is impossible for it to manufacture its particular kinds of products by employing modern industry methods. This is further demonstrated by the fact that the defendant owns the General Mold and Machinery Company, a manufacturer of automatic

9. At the age of 14, during and after graduation from high school, he worked in the old Chicago Heights Bottle Works, Illinois, as a "snap-up" boy. He carried and cleaned iron and molds, and worked as a tray-boy in the packing house, and as a tank shearer until December, 1931, when he became an Apprentice Mold Maker. Thereafter, he became a Journeyman and engaged in union activities. He remained here through the company's change to the Kimball Division of the Owens-Illinois Glass Company until 1941, when he left to go to the defendant's plant as a Journeyman Mold Maker, and served in that capacity until 1955. During this period, he was Chairman of the Union Negotiating Team and held that position for 15 years. In June, 1955, he became General Foreman of the New Mold Department and Mold Production Department for a year, then was appointed Bottle Production Manager of the Wheaton Glass Companies. The latter position placed him in charge of all activities of the "hot end" manufacturing of glass containers. On April 10, 1959, he became Plant Manager of T. C. Wheaton Glass Company and Wheaton Glass Company, which merged a few years ago, and is now known as Plants No. 1 and No. 2 of the Wheaton Glass Company.

His present position is General Factories Manager. For years he has been a staff member of the Glass Container Industry Research Corporation, which consists of all major glass container manufacturers in the United States. Its purpose is to improve all operations in the industry through research of furnace treatment, designing, engineering, packaging and other things calculated to improve and preserve the industry against inroads from plastics, rubber, tin, aluminum and other types of container manufacturers. He is also a staff member of the Foreign Division Technical Staff of the Wheaton Glass Company, which involves search for and exchange of knowledge and technical "know-how," with glass-container companies in Europe and South America. His interests and activities on behalf of Wheaton, and the Industry itself, have taken him into the fields of planning, designing, staffing and managing of other plants as well as the inspection, study and research of all the operations in all the major glass-container manufacturing companies throughout the United States, Europe and South America.

10. The size of the ware ranges from ½" high x ½" in diameter to 1' high x 6" in diameter.

inspection and conveying equipment, which it sells to the glass industry. The defendant has available in its own plants more than $100,000 worth of this type equipment which it seldom, if ever, uses because it is impossible to do the job required in view of the varying and irregular sizes and shapes of its containers. Despite extensive inquiry by the defendant, no other company has been able to produce a machine that can be utilized by it, at a cost less than prohibitive, since the potential market for such a machine would be limited solely to the defendant. It seems appropriate to observe that the defendant would avail itself of the wonders of this Age of Automation, if it could do so, but it cannot. Consequently, the defendant has been and is compelled to resort to well established, old-fashioned methods of individual physical inspecting, selecting and packing at the lehrs, all of which requires utmost flexibility in the deployment and maximum utilization of its male labor force. In meeting the broadly diversified demands of its customized orders,[11] the defendant's differentiation in duty assignments seems realistically geared to its unique "job shop" character. Uniqueness is further indicated by the fact that the defendant solely has the facility and does produce "amber nosolvit hard flint" glass containers; solely can and does engage in straight-line decoration (a separate process whereby containers leave the "hot end," bypass the inspecting lehr and proceed by conveyor directly to the decoration department where they are inspected, selected, decorated and packed); and solely can and does accept small orders from customers. All of which is so because of the defendant's characteristic "job shop" peculiarity.

The most persuasive evidence of the need for flexibility, as well as of the divergence between the job functions of the male and female selector-packers, is demonstrated when a lehr is "down,"[12] i. e., not operating at a particular time upon the completion of a product run and prior to a new run, or because of realignment of conveyors, or for repairs, emergencies, etc. Unlike standard plants where lehrs are seldom down, except for repairs or other maintenance problems, interruption of defendant's lehrs is frequent, essential and characteristic of its type of specialized production. When a lehr is "down," use must be made of its idled employees, otherwise they would be sent home and unpaid. To the mutual advantage of both management and labor, the defendant adopted a procedure whereby the work crew of the lehr, consisting of all females and those males unassigned to other duties, is transferred to an area known as "Resort." The function of the resort area is to provide further selecting and packing of that ware which has been rejected by the Quality Control and Inspection Department, to which the initially selected ware was submitted. The duties at the resort tables, performed by both males and females, are substantially the same as those performed at the lehrs. It is undisputed that females are occupied exclusively in the task of inspecting and packing of acceptable ware either at the lehrs or the resort area. (There was testimony that women spend 98.04 percent of their time selecting and packing while men are similarly engaged 81.74 percent[13] of their total time, the bal-

---

11. Exhibits D–52 to D–66 inclusive, demonstrate the variety of defendant's specialized products. Interestingly enough, in some parts of defendant's plant, the ancient and fascinating art of glass blowing is still practiced.

12. The testimony reveals that from January 1964 through September 1967, there were 5.29 job changes per day, or 6,890 changes. Lehrs are "down" during these changes. Lehrs are also "down" for other reasons, such as mechanical breakdowns, power outages (electrical failures, occurring 6 times during the summer of 1967), conducting of experiments and manufacturing of samples, etc. Further, it is not unusual for there to be 3 job changes in one shift, or 8, 9 or 10 changes in any one particular day.

13. These percentages were computed by a qualified Consulting Engineer who conducted an around-the-clock work sampling

ance of which is devoted to other duties). Nor is there any dispute that, in addition to selecting and packing at the lehrs or in resort, male selector-packers perform other duties. It is this area of "other duties," their necessity, nature, extent, and whether they are substantial enough to warrant the existing wage differential between the sexes, that lies at the core of our problem.

Attention has already been directed to some 16 or 17 different and specific duties performed by males and not by females. Other factors to be considered, and distinctions to be made, are the six-month training or probationary period for men and that of three months for women; the greater flexibility in the use of the defendant's pool of employees made possible by the availability of men for work in excess of ten hours in any one work day and 54 hours in any one work week,[14] since the plant is in full production, 24 hours a day, 7 days a week; the excessive "absenteeism" of the females on a three to one ratio to the males, causing more than mere inconvenience in such a full time production plant, for its results in gaps in the labor lines which must be filled on short notice by the use of males at a higher base rate and at the usual overtime rate.

Defendant denies that distinction in sex lies at the heart of its wage disparity. It insists that the practical factors upon which its wage disparity is based are primarily the performance of the essential overall duties of the male selector-packers, involving as they do additional effort, skill, judgment and responsibility, made necessary by the peculiar character of its specialized type of operations. This being so, it argues, such real, practical and reasonable bases constitute factors other than sex as provided by the express exceptive language of the Act, and consequently there is no evasion in any sense of the salutary economic equality in sexes established by Congress.

The basic issue, of course, requires a determination of whether there is a difference in fact between male and female performance in the job of selector-packer and, if so, whether such difference is essential and substantial enough to constitute a realistic economic basis for disparity in wage rates. However, if such difference is merely incidental, insignificant and unsubstantial to the performance of the principal task of the department in question, then it must be concluded that it is more artificial than real, leaving sex as the only realistic and distinctive basis for the wage disparity, contrary to the Act.

As heretofore stated, the declared purpose of the Act was to eliminate discrimination in wage payments to employees on the basis of sex where equal work was being performed by both men and women under the same or similar working conditions. However, if the differential is based upon any other factor other than sex, then that differential is beyond the reach of the Act. Legal precedents for guidance in the interpretation of this Act are few.[15] It is readily

---

study covering 3 shifts from September 25, 1967 through October 7, 1967, wherein he made 118 trips and 5,455 observations.

14. Females are restricted by New Jersey law to these maximum hours for reasons of health, welfare and safety. R.S. 34:2–24, N.J.S.A., in pertinent part, provides: "No female shall be employed or permitted to work in any manufacturing or mercantile establishment, bakery, laundry or restaurant more than ten hours in any one day or more than six days, or fifty-four hours in any one week." L.1912, c. 216 § 1, p. 337, as

amended L.1921, c. 194 § 1, p. 510 [1924 Suppl. § 107–137C(1)].

15. Wirtz v. Basic, Inc., 256 F.Supp. 786 (D.C.Nev.1966); Kilpatrick v. Sweet, 262 F.Supp. 561 (D.C.Fla.1967); Wirtz v. Rainbo, 17 WH 598, 54 LLC. ¶ 131 p. 884 (E.D.Ky.1967), not yet official reported; Wirtz v. Dennison, Mfg. Co., 265 F.Supp. 787 (D.C.Mass.1967); Wirtz v. Meade Mfg., Inc., 285 F.Supp. 812 (D.C.Kan.1967); cf. Bowe v. Colgate-Palmolive Co., 272 F.Supp. 332 (D.C.S. Ind.1967), appeal pending in the Seventh Circuit. The War Labor Board decisions turned on "comparable" work and

apparent that, in cases of this nature, the facts of work performance are the vital ingredients in determining the application of the Act. Factual resolution must be made on a case to case basis. In addition to conflicting views regarding the significance of job differences, the parties have advanced diametrically opposed contentions with respect to the intention of the Act. If there be some doubt of the statutory intent regarding the elements of the Act, its interpretation and application, as well as the burden of proof in cases of alleged violation, the Court may resort to the legislative history for the meaning attributed by the sponsors to the bill before its passage. Statements of sponsors of legislation provide an important and useful source of Congressional intent and purpose. Schwegmann Bros. v. Calvert Distillers Corp., 341 U.S. 384, 394–395, 71 S.Ct. 745, 95 L.Ed. 1035 (1951), reh. den. 341 U.S. 956, 71 S.Ct. 1011, 95 L. Ed. 1377 (1951), quoted with approval in National Woodwork Mfgrs. Ass'n v. NLRB, 386 U.S. 612, 640, 87 S.Ct. 1250, 18 L.Ed.2d 357 (1967), reh. den. 387 U.S. 926, 87 S.Ct. 2026, 18 L.Ed.2d 985 (1967). The legislative history of the Act clearly reveals that Congress intended to substitute the word "equal" for the former word "comparable," thereby meaning "substantially identical" rather than merely "similar" work.[16] Additionally, it employed two dissimilar concepts when it used both words "equal" and "similar" within the same sentence, obviously attributing different meanings to each, i. e. "equal" to work and "similar" to conditions. When the proposed Bill for equal pay was carried over from the 87th to the 88th Congress, the word "equal" was recommended by the Subcommittee. Not only was "equal" subsequently adopted by Congress as the vital spinal cord in the body of the Act, but the Act, itself, was named the "Equal Pay Act of 1963" and mandated the equation of equal pay for equal work—not almost, not like, not comparable and not similar, but "equal." In the difficult search for the precise meaning of statutory words, it is fortunate that the United States Congress provides the unique baffle of legislative history, lending a reliable measure of exposition in sound and depth to its statutory pronouncements. After much debate in both Houses, regarding clarification and the significance to be attributed to the concept "equal," Congress expressly set forth the elements of "skill," "effort" and "responsibility," as its components and guidelines in the interpretation and application of the Act.[17] So, also, was the key factor of *sex discrimination* explained. For as was said by Congressman Goodell, in speaking of intent of the Act, "[W]e want the private enterprise system, employer and employee and a union, if there is a union, to have a maximum degree of discretion in working out the evaluation of the employee's work

---

are inapposite subjudice. See also, Weeks v. Southern Bell Tel. & Tel. Co., 277 F.Supp. 117 (S.D.Ga.1967), regarding protective legislation and occupational qualifications for females.

16. Since 1945 equal pay bills have been introduced in every session of Congress by members of both political parties without much success. The use of female help in World War II economy, during a shortage of male help, generated much agitation to secure a man's wage for a man's work performed by a female. However, much of the proposed legislation pivoted on the word "comparable" and was found be objectionable, as lacking sufficient objectivity regarding work performance. It was not until the 88th

Congress, that enactment of the Equal Pay Act became possible by the significant change of "comparable" to "equal." Congresswoman Katherine St. George, who proposed the word "equal," stated that it connoted the Webster Dictionary definition of exactness in measure, quantity, number or degree, and like in value, quality, and status or portion, implying no difference in amount, number or value. (108 Cong.Rec. 14767). Such meaning of the St. George amendment was approved by the House (108 Cong. Rec. 14771), passed by the 87th Congress, but did not receive action by the Senate before the Session ended.

17. Ibid., n. 2.

and how much he should be paid for it * * * [Sex] is the sole factor that we are inserting here as a restriction."[18] It was he who authored the first bills proposing that the equal pay provisions be placed within the Fair Labor Standards Act and that the terms "effort," "skill," "responsibility" and "similar working conditions," in exposition of the phrase "equal work," be incorporated therein.

Again, it was Congressman Goodell, joined by Congressmen Frelinghuysen and Griffin, who stated that in the event of alleged violations, it was the intention of the Bill to place two burdens of proof upon the Secretary of Labor: one, that of establishing a discrimination based on sex and, two, that of proving that such discrimination was not in fact based upon some other factor, other than sex.[19] However, in the Upper House, the Chairman of the Senate Subcommittee, who guided the Bill through that body, declared that an employer who interposes a defense of exception to coverage assumes the burden of proving that it comes within the exceptive provisions of the Act.

■ The Act itself makes no express provision for the imposition of the burden of proof on either party. However, after its passage, the Wage and Hour Administrator, recognizing the divergence of views expressed in both Houses, adopted as an administrative interpretation the view of the Senate that the burden was upon the employer. 29 CFR § 800.141. The Administrator's interpretation of the legislation, charged as he is with its actual enforcement, is entitled to great weight. Idaho Sheet Metal Works, Inc. v. Wirtz, 383 U.S. 190, 86 S.Ct. 737, 15 L.Ed.2d 694 (1966). The view imposing the burden upon the

employer is the better one. Traditionally, one who alleges must prove. When the Secretary charges a violation, the burden of proof is his. Similarly, when an employer asserts an exception as an affirmative defense, the burden of proof is his. By way of analogy, the Supreme Court, in cases of claimed *exemption* from coverage by the Act, has placed the burden of proof upon the claimant or employer. Idaho, ibid, pp. 206, 208, 86 S.Ct. 737; Arnold v. Ben Kanowsky, Inc., 361 U.S. 388, 80 S.Ct. 453, 4 L.Ed.2d 393 (1960); Mitchell v. Kentucky Finance Co., 359 U.S. 290, 79 S.Ct. 756, 3 L.Ed.2d 815 (1959); Walling v. General Industries Co., 330 U.S. 545, 67 S.Ct. 883, 91 L.Ed. 1088 (1947). Its rationale seems far more compelling for acceptance in cases of undisputed coverage under the Act, but where, as here, *exception* is asserted.

■ It is precisely within the sphere of the statutory general exception of "any other factor other than sex," that the defendant has met its burden and demonstrated in a most convincing manner that substantial differences exist, in fact, in the full job cycles between the sexes, thereby justifying the disparity in their wages.[20] Hardheaded industrial performance is demanded by the defendant in its "around-the-clock" business, which work performance must be practically and reasonably geared to its bisexual labor supply with its distinctive utility. The Act was never intended to circumscribe an employer's appraisal or determination of the need and utilitarian value of an employee's performance. What was intended was prohibition of specious distinction based upon sex alone, all other things being equal.[21]

It seems reasonably clear, both from the legislative history and the express

---

18. 109 Cong.Rec. 9198 (1963).

19. 109 Cong.Rec. 9196, 9203 and 9208.

20. 29 CFR §§ 800.119-123.

21. "As the legislative history makes clear, the equal pay standard provided by the Act is designed to eliminate any wage rate differentials which are based on sex; nothing in the equal pay provisions is intended to prohibit differences in wage rates that are based not at all on sex but wholly on other factors." 29 CFR § 800.119 p. 618; See S.Rept. No. 176, 88th Cong. 1st Sess., p. 4; H.Rept. No. 309, 88th Cong. 1st Sess., p. 2, U.S. Code Cong. & Admin.News 1963, p. 687.

statutory declaration of the Equal Pay Act, that discrimination in the payment of wages shall not be based upon sex under the Fair Labor Standards Act, of which it is now a part, any more than it might be based upon religion, color or national origin under the Civil Rights Act.[22]

A consideration somewhat in depth of the divergence in job content of defendant's male and female selector-packers tends to demonstrate that sex is a mere incidence to the real difference in their respective performances. True, in the assembly line phase of selecting and packing both men and women perform identical functions. If nothing more remained to be done, and in fact was not done, then it would seem clear that within the confines of this work function, they would be performing equal work for which equal pay should be mandated. But, the evidence demonstrates that such is not the case. For the job of the male neither begins nor ends with that particular performance, as it does with the female. It is the extended scope of the male's job requirements coupled with other distinguishing factors, heretofore set forth, and their cumulative effect upon which focus must be directed. So viewed, the proof amply demonstrates that men and women do not perform equal work under similar conditions within the intendment of the Act. To the contrary, men are required to exert additional effort, to possess additional skill and to have additional responsibility, which frequently are performed and discharged under the ever changing demands of working conditions, dissimilar to those prevailing for women.

In conclusion, the plaintiff-Secretary of Labor has failed to carry the burden imposed upon him by the Act, of proving that defendant's wage differential is based upon sex discrimination. In contrast, the defendant has discharged its burden of proving that it is within an exception to the general standard of wage equality imposed by the Act, for the acceptable proof convincingly demonstrates that the defendant's disparity in wages is based upon factors other than sex, and, consequently, as a matter of law, it is not in violation of the Act.

The foregoing opinion shall be in lieu of findings of fact and conclusions of law in compliance with Rule 52, F.R.Civ.P., 28 U.S.C.

Counsel shall submit an appropriate order for judgment in favor of the defendant.

---

22. Title VII, Civil Rights Act of 1964, 42 U.S.C. § 2000c et seq.; Bowe v. Colgate-Palmolive Co. etc., n. 15, ante.