W. Willard WIRTZ, Secretary of Labor, United States Department of Labor, Plaintiff,

v.

AMERICAN CAN COMPANY—DIXIE PRODUCTS, a corporation, Defendant.

Civ. A. No. 2039.

United States District Court
W. D. Arkansas,
Fort Smith Division.

Aug. 14, 1968.

Beverley R. Worrell, Regional Atty., U. S. Dept. of Labor, Oliver M. Cooper and Carl W. Gerig, Jr., Attys., Dept. of Labor, Atlanta, Ga., for plaintiff.

Edgar E. Bethell of Bethell, Stocks, Callaway & King, Fort Smith, Ark., for defendant.

## OPINION

JOHN E. MILLER, Senior District Judge.

This case was tried to the court on July 17–19, 1968, on the question of liability as alleged in paragraphs IV and V. The question as alleged in paragraph VI of the complaint was reserved for further consideration depending upon the decision on the question of liability. At the conclusion of the evidence the court requested the attorneys for the respective parties to submit to the court their argument on the facts and their contentions as to findings of fact as established by the evidence, and if they desired, they might submit a request for formal findings of fact and conclusions of law in accordance with what they contend to be the facts and applicable law.

The complaint was filed December 10, 1966, charging a violation by defendant of certain sections of the Fair Labor Standards Act of 1938, as amended, 29 U.S.C. § 201 et seq. Paragraphs IV, V, and VI are as follows:

"IV

"Defendant, an employer having employees subject to the provisions of section 6 of the Act, as aforesaid, has repeatedly violated, and it is violating, the provisions of sections 6(d) and 15(a) (2) of the Act by discriminating, within its aforesaid establishment in which such employees have been and are employed, between employees on the basis of sex by paying wages to

employees in its cup-forming department within such establishment at rates less than the rates at which it pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort and responsibility, and which are performed under similar working conditions.

"V

"Defendant has repeatedly violated, and it is violating, the provisions of section 15(a) (1) of the Act in that it has transported, offered for transportation, shipped, delivered, and sold in interstate commerce, from its aforesaid place of business to other states, goods in the production of which many of its employees were employed in violation of section 6 of the Act, as alleged.

"VI

"Since on or about June 11, 1965, defendant has repeatedly violated, and it is violating, the aforesaid provisions of the Act, and a judgment enjoining and restraining the violations hereinabove alleged is expressly authorized by section 17 of the Act;"

The prayer of the complaint is that the defendant, its officers and employees, and those persons in active concert or participation with them, be permanently enjoined from violating the provisions of §§ 15(a) (1) and 15(a) (2) of the Act, and for such other and further relief as may be necessary and appropriate, including the restraint of any withholding of payment of wages found by the court to be due to employees under the Act.

The answer of the defendant was filed December 29, 1966, in which the defendant admitted the jurisdictional allegations of paragraphs I, II and III of the complaint and denied paragraphs IV, V and VI.

The Equal Pay Act of 1963, enacted June 10, 1963 (P.L. 88–38, 77 Stat. 56), added subsection (d) to Section 6 of the Fair Labor Standards Act, 29 U.S.C. § 206(d) (1), as follows:

"(1) No employer having employees subject to any provisions of this Section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to

(i) a seniority system;

(ii) a merit system;

(iii) a system which measures earnings by quantity or quality of production; or

(iv) a differential based on any other factor other than sex:

*     *     *     *     *     *

(2) No labor organization, or its agents, representing employees of an employer having employees subject to any provisions of this section shall cause or attempt to cause such an employer to discriminate against an employee in violation of paragraph (1) of this subsection.

*     *     *     *     *     *

(4) As used in this subsection, the term 'labor organization' means any organization of any kind, or any agency or employee representation committee or plan, in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rate of pay, hours of employment, or conditions of work."

At the trial the plaintiff offered in evidence certain requests filed by him for admissions and the response thereto, but the defendant objected to the intro-

duction of only a portion of the requests and response, and therefore all of the requests submitted on August 31, 1967, and the response of defendant filed September 18, 1967, were admitted.

It is admitted that the defendant, American Can Company—Dixie Products, manufactures, among other items, six basic types of cups and containers that are transported in interstate commerce from defendant's place of business in Fort Smith, Arkansas, to other states. The defendant employs approximately 545 employees in its entire operation of the manufacture and distribution of its products.

### Contentions of the Parties

The defendant on its brief states:

"The pleadings and testimony in this matter give rise potentially to three issues to be resolved: First, has the defendant since June 11, 1965, discriminated between its employees on the basis of sex? Second, if such discrimination or differentiation is found, are the jobs for which different rates are paid equal work, the performance of which requires equal skill, effort and responsibility, and which are performed under similar working conditions? Third, if there is a differential paid for equal work, is it based on any factor other than sex?

"We submit that the evidence establishes without significant conflict that the first two issues must be answered in the negative, and the third in the affirmative."

As to the issues stated by defendant, the plaintiff as to the first question contends that the "duties of cup machine operators on each of the three shifts are the same other than the loading function." In summary, plaintiff argues:

"The jobs and job classifications of cup machine operators—(A.M.–P.M.)' shift and cup machine operator—'(NIGHT)' shift are the same, their performance requiring equal skill, effort, and responsibility, and are performed under similar working conditions. No factor other than sex appears as the basis of the differential in base wage rates as between the operators of cup forming machines on the '(A.M.–P.M.)' shift and the operators of cup forming machines on the '(NIGHT)' shift."

The defendant normally operates on a three-shift basis: First shift from 7:00 a. m. to 3:00 p. m.; Second shift from 3:00 p. m. to 11:00 p. m.; and Third shift from 11:00 p. m. to 7:00 a. m. The first and second shifts are commonly referred to as the "AM–PM" shifts, while the third shift is referred to as the "Night" shift.

Since 1951 the production employees of defendant have been represented by the International Brotherhood of Pulp, Sulphite and Paper Mill Workers, AFL–CIO, Local Union No. 656, for purposes of collective bargaining with respect to rates of pay, wages, hours of employment and other conditions of employment. Prior to the effective date of the Equal Pay Act, supra, it was the traditional practice of the defendant and the Union to provide separate wage rates for "male" and "female" employees in the job classifications in which both males and females were employed. This practice was incorporated in all of the labor agreements until the Collective Bargaining Agreement of October 1, 1965-September 30, 1966, but effective June 11, 1965, the defendant changed its policy on the matter of awarding job openings to specifically open all job classifications to all employees without regard to sex.

While there is nothing in the language of this agreement, or for that matter in the language of the preceding collective bargaining agreements which limits the rights of employees to employment opportunities on the basis of sex, the company and the Union, in order to clear up any uncertainty in this regard, adopted a formal interpretation of the language

of the contract relating to reductions in force in cup forming machine classifications.[1]

This interpretation (Defendant's Exhibit No. 20) affirms the eligibility of Cup Machine Operators—NS to ask for assignment to positions as Cup Machine Operators—AM & PM, and vice versa, in the event of a reduction in force. This was nothing more than an interpretation of the agreement, not an amendment of it. The document constitutes a formal recognition and acknowledgment by the employees' certified representatives that there is in fact a significant difference in job content between the classifications, Cup Machine Operator—AM & PM and Cup Machine Operator—NS.

No woman has worked in the classification Cup Machine Operator—NS. This is understandable in the light of the requirements of the classification which will be discussed later. There have been 16 instances between June 11, 1965, and October 1, 1967, in which male employees were awarded job openings in the classification of Cup Machine Operator—AM & PM. A number of these employees, after being awarded the job opening, declined to accept the award.

The rate of pay on October 1, 1965, for Operators on the AM & PM shifts was $1.85 per hour and on the Night Shift was $1.96 per hour. Rates of pay were not determined by the sex of the operator but by the classification held by the operator. In addition to the base rates, a "production bonus" was paid to all employees regardless of the employee's sex and regardless of the shift on which the employee worked. Apart from the production bonus, specifically designated "shift premiums" of 5 cents per hour and ten cents per hour were paid to all employees working the second or PM and the third or Night shifts respectively.

In the Forming Machine Department approximately 60 to 65 female cup machine operators were usually employed, approximately 34 on the AM shift and 31 on the PM shift. At the same time approximately 25 males were employed at various times as Cup Machine Operators on the third shift.

1. "LABOR CONTRACT INTERPRETATION

"As of the signing of this Agreement, the following interpretations shall be in effect under Article VIII, 'Seniority', Section III, 'Reduction in Force': B.

"For purposes of this section only, employees assigneed as DCM, MCM, RHM, RCM, VCM, BTE, Relief and Training and Handle Applicator Operators-Night Shift, shall be deemed to have 'previous experience' as DCM, MGM, RHM, RCM, VCM, BTE, Relief and Training and Handle Applicator Operators A.M.-P.M. Shifts. Whenever reductions in force affect night shift Operators, the employees so affected may replace A.M.-P.M. Operators in line with their plant seniority. When these moves are made, the applicable rate, ($1.85) and job duties will be in force.

"Whenever reductions in force affect A.M. and P.M. Operators, the employees so affected may replace night shift Operators in line with their plant seniority. In this instance, however, the employees must demonstrate that they can perform all of the duties of the job over the full work cycle during the whole shift on a daily basis. When this has been demonstrated, the employees will be deemed to have the necessary 'previous experience' and will receive the applicable rate ($2.02).

| For the Company | For the Union |
|---|---|
| /s/M. A. Reinhard | /s/ Reeves H. Brunk |
| Plant Manager | International Representative |
| H. E. Freeman | /s/ Don R. Owen |
| Field Director | Local Union Representative" |
| Jan. 17, 1966 | |
| Date | |

In cases of this nature the facts of work performance are vital ingredients in determining the application of the Act. Before considering the evidence to determine whether there is a difference in fact between male and female performances in the job of Cup Machine Operator in the Forming Machine Department, and if so, whether such difference is essential and substantial enough to constitute a realistic, economic basis for disparity in wage rates, the court will discuss the provisions of the Act and the intention of the Congress in the enactment of the Act.

House of Representatives Report No. 309, which accompanied H.R. 6060, was before the Senate when it was considering S.1409, which it passed in lieu of the House bill, after substituting for the language of the Senate bill the text of the House bill. The report appears in U.S. Code Congressional and Administrative News, 88th Congress, 1st Session, 1963, at pages 687–692. Beginning at the bottom of page 688 the following appears:

"The bill (H.R. 6060) refers to 'equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions.'

"This language recognizes that there are many factors which may be used to measure the relationships between jobs and which establish a valid basis for a difference in pay. These factors will be found in a majority of the job classification systems. Thus, it is anticipated that a bona fide job classification program that does not discriminate on the basis of sex will serve as a valid defense to a charge of discrimination.

"Three specific exceptions and one broad general exception are also listed. It is the intent of this committee that any discrimination based upon any of these exceptions shall be exempted from the operation of this statute. As it is impossible to list each and every exception, the broad general exclusion has been also included. Thus, among other things, shift differentials, restrictions on or differences based on time of day worked, hours of work, lifting or moving heavy objects, differences based on experience, training, or ability would also be excluded."

Exception IV, "a differential based on any other factor other than sex," is listed by the Committee as a broad, general exception.

The effective date of the Equal Pay Act of 1963 (Pub.Law 88–38; 77 Stat. 56) was one year from the date of its enactment, or June 10, 1964. However, with respect to collective bargaining agreements already in force on that date, the Act became effective upon the termination of the agreement or upon the expiration of two years from the date of enactment, whichever occurred first.

The Administrator of the Department of Labor, Wage and Hour Division in his regulations, 29 Code of Federal Regulations, Part 800, has recognized that when jobs are compared for equality, the duties over the full work cycle must be considered, and that the amount of time devoted to a particular function is not the sole criterion for measuring its importance.

Section 800.119 states:

"In applying the various tests of equality to the requirements for the performance of such jobs, it will generally be necessary to scrutinize the job as a whole and to look at the characteristics of the jobs being compared over a full work cycle. This will be true because the kinds of activities required to perform a given job and the amount of time devoted to such activities may vary from time to time. As the legislative history makes clear, the equal pay standard provided by the Act is designed to eliminate any wage differentials which are based on sex; nothing in the equal pay provisions is intended to prohibit differences in

wage rates that are based not at all on sex but wholly on other factors."

Section 800.123 provides:

"In determining whether differences in job content are substantial in order to establish whether or not employees are performing equal work within the meaning of the Act, the amounts of time which employees spend in performance of different duties are not the sole criteria. It is also necessary to consider the degree of difference in terms of skill, effort and responsibility. These factors are related in such a manner that a general standard of determining quality of jobs cannot be set up solely on the basis of a percentage of time."

Section 800.122 acknowledges that where job requirements are found to be unequal, the extent of the pay differential is not material:

"There are, of course, situations in which a review of all the pertinent facts will clearly establish that male and female employees in question are not performing equal work on jobs which are equal in their requirements of skill, effort, and responsibility and which are not performed under similar working conditions. Where it is clear that this is so, the existence or extent of a wage differential between employees of opposite sexes cannot of itself provide a basis for holding an employer liable for violations under the provisions of Section 6(d) of the Act."

Section 800.121 provides:

"Application of the equal pay standard is not dependent on job classifications or titles but depends rather on actual job requirements and performance."

Section 800.127 provides:

"The jobs to which the equal pay standard is applicable are jobs that require equal effort to perform. Where substantial differences exist in the amount or degree of effort required to be expended in the performance of jobs, the equal pay standard cannot apply even though the jobs may be equal in all other respects. Effort is concerned with the measurement of the physical or mental exertion needed for the performance of a job. Where jobs are otherwise equal under the Act, and there is no substantial difference in the amount or degree of effort which must be expended in performing the jobs under comparison, the jobs may require equal effort in their performance even though the effort may be exerted in different ways on the two jobs. Differences only in the kind of effort required to be expended in such a situation will not justify wage differentials."

Section 800.132 provides:

"Generally, employees performing jobs requiring equal skill, effort, and responsibility are likely to be performing them under similar working conditions. However, in situations where some employees performing work meeting these standards have working conditions substantially different from those required for the performance of other jobs the equal pay principle would not apply."

Section 800.145 provides:

"When applied without distinction to employees of both sexes, shift differentials, incentive payments, production bonuses, performance and longevity raises and the like will not result in equal pay violations. For example, in an establishment where men and women are employed on a job, but only men work on the night shift for which a night shift differential is paid, such a differential would not be prohibited."

The court has reviewed all of the applicable reported opinions dealing with this section of the Act. The fundamental question is one of fact, and most decisions are not of any great help since each case depends upon its own particular facts. Probably the most instructive case, nearest in point factually, is Wirtz v. Dennison Manufacturing Co. (D.C.

Mass.1967) 265 F.Supp. 787. As in the present case, the defendant had a three-shift operation, women traditionally operating the machines on the first and second shifts, and the men taking over on the third. On the first two shifts, all heavy work of bringing up boxes of tags and heavy rolls of wire was done by men adjusters. On the third shift, men operators did this for themselves. In addition, the men on the third shift did more set-up and adjusting than was performed by employees on the first and second shifts. The court also mentioned that there were fewer supervisors on the third shift. In concluding that the work was not equal, the court at page 790 said of the work on the night shift:

"They also had to perform the task of moving their own materials to and from their machines, a task which required physical effort which the women operators who testified said they could not or would not perform. These activities, while they may not have taken up more than 10 per cent of the men's working time were an essential part of their task which they had to perform on every working night and without which the job could not have been performed. They were clearly far more than incidental or occasional extra work. Thus the facts here differ from those in Wirtz v. Rainbo Baking Company of Lexington, (C.A.No.1682 D.C., E.D.Ky. decided December 20, 1966). Nor do we have a situation where the additional requirements of the job are readily separable because performed at identifiable times and places so that it would be possible to break up a work week into separate portions having different rates of pay. Cf. Wirtz v. Basic, Incorporated, D.C., 256 F.Supp. 786, 791. Furthermore these men worked for the most part without supervision and therefore had to assume a certain degree of responsibility for completing the orders assigned to them."

Another case involving a somewhat comparable factual situation is Wirtz v. Wheaton Glass Co. (D.C.N.J.1968) 284 F.Supp. 23. There, men and women were both employed in a single classification called "Selector-Packer," but received different rates of pay. Apparently the men and women were employed on the same shifts. The basic function performed by these employees was the same, but the men, in addition, did heavy lifting. In searching for guides to aid in resolving the fact question, the court carefully examined the legislative history of the Act, and at page 32 commented:

"The legislative history of the Act clearly reveals that Congress intended to substitute the word 'equal' for the former word 'comparable,' thereby meaning 'substantially identical' rather than merely 'similar' work. Additionally, it employed two dissimilar concepts when it used both words 'equal' and 'similar' within the same sentence, obviously attributing different meanings to each, i. e., 'equal' to work and 'similar' to conditions. When the proposed Bill for equal pay was carried over from the 87th to the 88th Congress, the word 'equal' was recommended by the Sub-Committee. Not only was 'equal' subsequently adopted by Congress as the vital spinal cord in the body of the act, but the Act itself, was named the 'Equal Pay Act of 1963' and mandated the equation of equal pay for equal work —not almost, not like, not comparable and not similar, but 'equal.' In the difficult search for the precise meaning of statutory words, it is fortunate that the United States Congress provides the unique baffle of legislative history, lending a reliable measure of exposition in sound and depth to its statutory pronouncements. After much debate in both Houses, regarding clarification and the significance to be attributed to the concept 'equal,' Congress expressly set forth the elements of 'skill,' 'effort' and 'responsibility,' as its components and guidelines in the interpretation and application of the Act. So, also, was the key

factor of *sex* discrimination explained. For as was said by Congressman Goodell, in speaking of intent of the Act, '[W]e want the private enterprise system, employer and employee and a union, if there is a union, to have a maximum degree of discretion in working out the evaluation of the employee's work and how much he should be paid for it * * * [Sex] is the sole factor that we are inserting here as a restriction.' It was he who authored the first Bills proposing that the equal pay provisions be placed within the Fair Labor Standards Act and that the terms 'effort,' 'skill,' 'responsibility' and 'similar working conditions,' in the exposition of the phrase 'equal work,' be incorporated therein."

The court concluded that the burden of proving that the jobs in question are equal rests upon the plaintiff, but that if the defendant claims an exemption, the burden of proving the facts supporting the exemption is upon him. On the facts of the case, the court concluded that the jobs were different and that the pay differential was based on factors other than sex. See Kilpatrick v. Sweet (D.C.Fla.1967) 262 F.Supp. 561.

The first fact question that should be determined by consideration of the evidence is: Has the defendant since June 11, 1965, discriminated between its employees on the basis of sex? Since June 11, 1965, all job openings in the classifications of cup machine operators were awarded regardless of sex. There is not one scintilla of evidence to establish that the fact that no female has worked on the night shift is in anywise related to sex. On January 10, 1967, one female, Barbara Loris, entered a bid for an opening in the classification of RCM Operator—Night Shift, but when she realized that the job was on the night shift, she withdrew her bid. The plaintiff did not inquire of the witness her interest in the classification. Another employee, Lenora Perkins, entered a bid on an opening in the classification of DCM Operator—Night Shift. She was not called as a witness. She was not considered for the opening on the night shift because at the time she entered her bid, she was still a probationary employee, and under the terms of the labor agreement, probationary employees are not eligible to bid on job openings. If there was in existence any evidence that the defendant denied any of its employees access to any of the classifications in the Forming Machine Department, such evidence was not introduced at the trial.

It is undisputed that male employees have asked for and been awarded jobs in the classification of Cup Machine Operator—AM & PM. When men are working in that classification, they have the same duties and are paid the same rate as women employed in the same classification. While, as above stated, no women have been employed in the classification of Cup Machine Operator—Night Shift, there is no evidence that they would be paid other than the applicable rate if they chose to work on the night shift. Neither is there provision in the Collective Bargaining Agreements between the company and the Union providing for but a single rate for each group of classifications.

The court is at a loss to understand the contention of plaintiff that the defendant has discriminated between its employees on the basis of sex. If such discrimination exists, the burden was on the plaintiff to establish the same. This burden was not discharged by the plaintiff.

The second issue is: If such discrimination or differentiation exists, are the jobs for which different rates are paid equal work, the performance of which requires equal skill, effort and responsibility, and which are performed under similar working conditions? There is no serious conflict in the testimony on this issue. The defendant manufactures, among other items, six basic types of paper cups and containers. Prior to the effective date of the Equal Pay Act,

22

the cup forming operators were divided into two different departments. One was identified as Forming Machine—AM & PM shifts, and the other Forming Machine—Night Shift. These departments were formally merged into one department by the Labor Agreement which took effect October 1, 1966, although informally, and well known to all the employees, all jobs in the Forming Machine Department were open to male and female alike after June 11, 1965.

There are several types of machines. DCM's (Dixie Cup Machines) constitute the largest number, 83. The next largest number are the RCM's (Rotary Cone Machines), 24. There are 9 BTE's (Bottom-Top Enders). There are 20 RHM's (Rotary Heavy Machines) in the plant, 12 in operation; 17 MGM's and 17 VCM's.

There are two types of paper rolls used in the DCM's and in some of the other machines—one for the "sides" of the cups and the other for cup "bottoms." The rolls for the sides are considerably larger and heavier than the rolls for the bottoms. The machines are roll-fed. In the DCM's the side rolls weigh between 200 and 600 pounds and bottom rolls weigh between 50 and 100 pounds. The MGM's are likewise roll-fed, the side rolls weighing from 400 to 600 pounds and the bottom rolls from 75 to 100 pounds.

The RHM's produce cups commonly used for hot drinks. These cups are double wrapped on the sides, and the side rolls weigh from 900 to 1000 pounds and the bottom rolls from 75 to 100 pounds.

The BTE's and their auxiliary machines are blank fed for the side walls and roll-fed for the bottoms. Bottom rolls weigh between 100 to 115 pounds. The sidewall blanks are stored and transported in "barns" or wooden boxes approximately 6 feet high by 4 feet wide by 2 feet deep, and contain from 30 to 60 thousand blanks, weighing 300 pounds empty and up to 1500 pounds when full.

The RCM's produce cone-shaped cups primarily used for water drinking cups. They have a rolled rim around the top and are roll-fed. The rolls weigh from 275 to 400 pounds.

The process of operating the machines is identical at all times, and all employees use the same machines. The basic difference in the job content of these classifications, which has always dictated and still requires and justifies different treatment, is the requirement that employees performing in the classification Cup Machine Operator—Night Shift, handle and load the paper required to make the machines function. This is not required of the employees working in the classification Cup Machine Operator—AM & PM. The Cup Machine Operators on the AM and PM shifts are not and have never been responsible for loading paper. This chore is performed in the DCM center by two utility men on each AM-PM shift, commonly called roll boys or paper boys. In the other centers this chore is handled by maintenance personnel on the AM-PM shifts.

There is no doubt whatsoever from the testimony in this record that the Cup Machine Operators on the AM and PM shifts do not have or exercise the function of handling and loading paper. It is equally well established that on the night shift the operators are required to handle and load the paper of the various machines being operated by them. Only one employee attempted to question or dispute the facts as above stated. He had previously worked on the night shift and was presently working on the AM-PM shift. On cross-examination, the witness, Mr. Ronald Bartlett, acknowledged that on the AM and PM shifts, the paper handling was done either by roll boys or by mechanics. This particular witness seemed to be biased or prejudiced for some reason or another. He admitted that since June 1965 he had been engaged in an effort to force the defendant to permit him to work on the first shift at the same rate of pay as he had received as an operator on the night

shift, even though he was not performing the same duties on the AM shift as he had while employed on the night shift. See, Cook v. Dixie Cup Division of American Can Company (W.D.Ark. 1967) 274 F.Supp. 131.

Keeping the machines on the AM and PM shifts supplied with paper requires two-thirds of the time of the two utility men assigned to those shifts, not to mention any assistance that is given by the mechanics assigned to those two shifts.

Another factor which leads to, and still justifies, the differential is the company's use of Night Shift Operator classifications as a source of maintenance personnel. Each witness who had managed the plant stated that the limiting factor on expansion has been lack of adequate maintenance personnel. Male operators on the third shift learn to operate the machines, work with maintenance personnel when a machine is being serviced, and thereby a basis is established for upgrading those with mechanical interest and aptitude into the maintenance classifications. That this purpose has been achieved is established by the fact that 63 of a total of 67 employees presently in Forming Machine Maintenance classifications have progressed through the Night Shift Cup Machine classifications.

Two women who have worked as Cup Machine Operators—AM & PM, testified that they had on rare occasions loaded bottom paper. Another VCM Operator testified that on one occasion she dragged a 73 pound can of blanks from the blanking machine to her forming machine. Neither of these women claimed that she had done this chore regularly or frequently.

Also, Mrs. Bonnie Ritter, with 11 years' experience as a Cup Machine Operator—AM & PM, acknowledged that she had never handled paper, as did Mrs. Ronald Bell. Pauline Ezell, with 15 years' experience, almost 13 years of which had been as a Relief and Training Operator in all of the centers on the AM

and PM shifts, said she had never seen a woman handle paper. The same testimony was given by Joan Conger and Marie Parker. Mr. Al Lux, who had worked at this plant 19 years and had been supervisor on the AM shift for 14 years, testified he had never seen a woman load paper. The same testimony was given by Dave Lollis, supervisor on the PM shift. Mr. Russell Grimshaw, who had been with the plant since 1962, and is now Plant Manager, stated he had never seen paper loading by an operator on the AM and PM shifts. The same testimony was given by Mr. Willard Brader, Assistant Plant Manager from the inception of the operation until he became Plant Manager in 1953 and continued as such until 1963. Likewise, Mr. M. A. Reinhard, Plant Manager from 1963 to 1967, testified he never saw operators on the AM and PM shifts handle paper.

In the light of the facts, it is obvious that the performance of the paper handling and loading function represents a substantial difference in the amount and degree of effort required. The fact that the company employs two utility men on the AM & PM shifts to handle the chore in the DCM Center alone where there is the largest number of machines to be serviced, and that it requires two-thirds of their time, is in itself indisputable evidence of the substantial difference between operator loading, and otherwise.

Nor can it be said that this additional effort is required only occasionally or sporadically. It is an indispensable function which occurs on every shift, in every center, and on every group of machines. The frequency may vary from shift to shift, but the fact that it will occur on every shift is certain.

There is also variation in the amount of effort required as among the various centers, and even within a particular center, for example, where one operator may have two, and another three, machines to service at any given time. In this respect the evidence established that there is considerable movement of oper-

ating employees from one center to another, due to absence, vacations, operation of seniority during reduction in force, job bidding and fluctuations in demand for a particular type of product. But regardless of the Forming Machine center in which the employee may be working, the operator in any of the Night Shift operating classifications is certain to be faced on each and every shift with the physical effort required to handle and load paper for the machines. At the very least, this represents a substantial and significant difference in the effort required of machine operators on the AM & PM shifts who neither have nor perform any of this work.

The management of defendant has actively and in good faith endeavored to comply with the requirements of the Equal Pay Act of 1963. The evidence is undisputed that beginning in November 1963, and thereafter, the executives of this company, both on a local and home office basis, have engaged in a thorough examination of the classifications and pay practices of this plant to ascertain compliance with the Act. One active classification was noted in which both men and women were employed at different rates of pay, and with regard to which justification of the differential by the standard set forth in the Act was doubtful. This was the classification called "Reinspector," in the Quality Department. Therefore, on the effective date of the Act, the rate paid females in this classification was raised to equal that paid men, even though the defendant did not feel the resulting rate was appropriate in relation to other comparable classifications.

Certainly, management and Union evaluation of job classifications is not binding on the court, but the judgment of these parties, based on their long and intimate knowledge of all factors involved, is worthy of serious considera-

tion. The record in this case establishes that management and Union representatives have for many years agreed that the pay differential here in question is merited. The court also agrees.

The words of District Judge Mitchell H. Cohen, in Wirtz v. Wheaton Glass Company, supra, 284 F.Supp. at page 33 are particularly applicable:

"It is precisely within the sphere of the statutory general exception of 'any other factor other than sex,' that the defendant has met its burden and demonstrated in a most convincing manner that substantial differences exist, in fact, in the full job cycles between the sexes, thereby justifying the disparity in their wages. [29 C. F.R. §§ 800.119–123]. Hardheaded industrial performance is demanded by the defendant in its 'around-the-clock' business, which work performance must be practically and reasonably geared to its bisexual labor supply with its distinctive utility. The Act was never intended to circumscribe an employer's appraisal or determination of the need and utilitarian value of an employee's performance. What was intended was prohibition of specious distinction based upon sex alone, all other things being equal."

It is not necessary to further consider this issue since the court has found as a fact that there was no discrimination and no differential paid for equal work.

Under the facts as established by the evidence and the applicable law, the defendant has not since June 11, 1965, discriminated between its employees on the basis of sex. The jobs for which different rates of pay are paid are not equal work, the performance of which requires equal skill, effort and responsibility, and which are performed under similar working conditions.

Therefore, judgment is being entered today dismissing the complaint of plaintiff.