W. Willard WIRTZ, Secretary of Labor, United States Department of Labor, Plaintiff,

v.

DENNISON MANUFACTURING COMPANY, Defendant.

Civ. A. No. 65-705.

United States District Court
D. Massachusetts.

March 28, 1967.

Charles Donahue, Sol., Edward G. Madden, Regional Atty., Albert H. Ross, Atty., Dept. of Labor, Boston, Mass., for plaintiff.

Vernon C. Stoneman, Stoneman & Chandler, Boston, Mass., for defendant.

## OPINION

FRANCIS J. W. FORD, District Judge.

This is an action under the provisions of the Equal Pay Act, § 6(d) (1) of the Fair Labor Standards Act of 1938, as amended, 29 U.S.C. § 206(d) (1) which provides:

"No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex: Provided, That an employer who is paying a wage rate differential in violation of this subsection shall not, in order to comply with the provisions of this subsection, reduce the wage rate of any employee."

Plaintiff alleges that defendant corporation has violated this section by paying certain male employees working on the third shift in its Department 42 at a higher wage rate than female employees on the first and second shifts, and seeks to enjoin defendant from paying these female employees at a rate lower than that paid the male employees.

Defendant has a manufacturing plant in Framingham, Massachusetts where it produces labels, tags, wrapping paper and related products for interstate commerce. It has at its Framingham plant about 2,200 employees, of whom 800 are female production employees and 1200 are male production employees.

In part of this plant defendant produces over 20 million tags per month. Thousands of different kinds of tags are made to meet customer specifications. In various departments these tags are cut and printed, have wire or string attached to them and are packed and shipped.

This action involves only Department 42, where the string or wire is attached to the tags. There are in this department 37 string and wire machines, including 14 mechanically different types of machines for performing different processes.

Since before 1960 there have always been at least two shifts operated in this department. On the first shift, working from 6 a. m. to 1:45 p. m. there were 21 machine operators whose base pay ranged from $1.675 to $1.708 an hour, and 2 adjusters who were paid at the hourly rate of $2.356 and $2.7625. On the second shift from 1:45 p. m. to 10:15 p. m. were 10 machine operators whose base rate ranged from $1.575 to $1.708 per hour, and two adjusters receiving $1.985 and $2.356 per hour. There was also a receiver-shipper paid $2.312 per hour, whose working hours covered part of each of these two shifts. During the period in question the machine operators were all women (except for one Spinelli, a male employee who worked for a time as a machine operator at the same rate as the female operators) and the adjusters and the receiver-shipper were men.

On these first two shifts the work of the operators is limited to running the machines and observing whether they are processing the tags properly. Before work can be performed on any particular tag order the appropriate machine must be set up to attach the wire or string according to specifications. This work is done by an adjuster who is allowed 20 minutes to perform this work. When an operator sees that a machine is not turning out tags properly she shuts down her machine, calls an adjuster and waits until he repairs the machine. If the repairs take more than 10 minutes she may be put to work on another order on a different machine.

Tags to be processed in Department 42 reach the department from other parts of the plant in various containers. Some come in boxes or cartons which are loaded on four-wheel trucks, the truck with its load weighing up to 350 pounds. Some come in system cases which when filled weigh generally from 75 to 90 pounds but may weigh up to 200 pounds. These have no wheels. They are lifted and carried by hand or a number of them may be loaded on a small skid or platform which is moved by use of an electric hand truck. The tags to be worked by each operator are brought to her machine, and the processed tags are taken from the machine to the shipping room. This work is done by the shipper-receiver or by the adjusters when they are not engaged in adjusting or repairing machines. The women themselves obtain rolls of string and light wire for use on the machines, but heavy rolls of wire used on some orders are brought to them by an adjuster.

During the first two shifts supervisors and foremen are regularly present in the department directing the work. From 7 a. m. to 3 p. m. there were 5 supervisors and 5 foremen; from 3 p. m. to 5 p. m., 1 supervisor and 6 foremen; and from 5 p. m. to midnight 1 foreman and 1 supervisor. The women on the first two shifts had all worked at these

machines for a number of years. They were experienced and efficient workers. Most of them regularly earned close to the maximum bonus possible under the employer's incentive bonus plan.

In October, 1960 defendant started a third shift working from 10 p. m. to 6 a. m. because full production requirements could not be met on the two existing shifts. Beginning in 1963 the third shift often started work at 9 p. m. In early 1964 defendant began investigating the installation of improved machinery. Several new machines were purchased and put into operation. With these new machines all production requirements could be handled by the first two shifts and the third shift was eliminated on May 31, 1966.

During the period it was in existence the size of the third shift varied between two and five employees, all male. The rates of pay for third shift employees ranged from $1.70 to $2.098 per hour. In addition to operating one of the machines, each of these employees had to change over his machinery when necessary in starting work on a new order, and also had to make repairs and adjustments when the machine was not operating properly. Generally, if repairs could not be made in 20 minutes, he was instructed to move to a different machine and work on another order, but on some orders he was told to spend as much time as necessary and try to get the order finished as soon as possible. Some of the machines operated on the third shift were those difficult to handle and adjust which were not usually run on the first two shifts.

In addition, each of the third shift employees had to get his own material to work on, push or carry it to his machine, and move his finished work to the shipping area. About three trips for stock had to be made each night, a trip requiring from 5 minutes to as long as 30 minutes.

After 2 a. m. and in most cases after midnight no supervisor was present on the third shift. In some cases some training or assistance was given to a new man on the shift by one of the more experienced men on that shift. Presumably also instructions were left for the men on the third shift as to which orders were to be worked on during the night.

Of the two men originally hired on the third shift, one was an experienced machinist and the other had formerly been a weaver for 25 years. These two men worked a few weeks on the second shift to learn about the machines. Included among the third shift employees were one who had been a drill and punch operator, one who had worked 22 years as an overseer in a textile plant and one who had been a drill press operator on heavy machinery and who upon termination of the third shift became an adjuster on one of the other shifts. All of the employees on the third shift had either passed the employer's mechanical aptitude test or had demonstrated some mechanical ability.

Defendant makes no contention here that the employees involved are not subject to the Act. It agrees also that its male employees on the third shift were paid at a base hourly rate greater than the rate paid to the female machine operators on the first and second shifts. Clearly, also, the actual work of operating the machine is the same on all shifts. There are, however, certain differences between the work of the men on the third shift and that of the women on the first two shifts. The real issue is whether these differences are, as plaintiff contends, merely incidental, insignificant and inconsequential, or whether, as defendant argues, they are so substantial as to justify the pay differential which existed.

■ The court finds that the difference was a substantial one. The men on the third shift had to possess skills not required of the women operators. Of course, they were not required to be experienced machinists, but they did have to possess a significant degree of mechanical skill and ability in order to change over their machines from job to job, and to repair them when necessary.

They also had to perform the task of moving their own materials to and from their machines, a task which required physical effort which the women operators who testified said they could not or would not perform. These activities, while they may not have taken up more than 10% of the men's working time were an essential part of their task which they had to perform on every working night and without which the job could not have been performed. They were clearly far more than incidental or occasional extra work. Thus the facts here differ from those in Wirtz v. Rainbo Baking Company of Lexington (C.A. No. 1682 D.C., E.D.Ky. decided December 20, 1966). Nor do we have a situation where the additional requirements of the job are readily separable because performed at identifiable times and places so that it would be possible to break up a work week into separate portions having different rates of pay. Cf. Wirtz v. Basic, Incorporated, D.C., 256 F.Supp. 786, 791. Furthermore these men worked for the most part without supervision and therefore had to assume a certain degree of responsibility for completing the orders assigned to them.[1]

▆ The conclusion must be that the job of the men on the third shift required to a substantial degree special skill and increased physical effort, and to some extent, greater responsibility which were not required by the job of the women on the first and second shifts, and consequently there was no violation of § 6(d) (1) in paying the men on the third shift at a higher rate.

There is no basis for any finding that the wage differential was in any way based upon or motivated by discrimination on the basis of sex. Plaintiff argues that defendant maintains a plant-wide policy of discrimination based on sex. The only basis for this contention is that defendant has traditionally classified various jobs as male or female. How-ever, it appears from the evidence that this listing has been made simply on the basis that the job called for physical strength or mechanical ability normally possessed by men, or for manual dexterity more likely to be possessed by women. Occasionally men were hired for production jobs normally classified as female, or vice versa, and paid at the same rate as other workers regardless of sex. In the laboratory and clerical departments men and women are frequently employed on the same jobs at the same rate of pay.

In the situation here involved, there is nothing to show that sex discrimination played any part in determining the pay rate on the third shift. Defendant's action was clearly justified by other adequate motives of an economic nature. The third shift required only a small number of employees. In fact the maximum number ever used was five. These small numbers did not justify a set-up such as that on the other shifts where machine operators were hired solely to run the machines and adjusters to perform the other duties involved in the operation. There was evidence that such an operation was economically feasible only when there were about ten machines in operation for each adjuster. Under the circumstances defendant's needs on the third shift were best met by a small number of workers each of whom could perform all the duties both of a machine operator and an adjuster, and at a higher rate of pay than that of a simple machine operator.

The conclusion is that the job of the employees on defendant's third shift did not involve equal work with the job of the machine operators on the first and second shifts but required greater skill, effort and responsibility and that the difference in pay between these jobs was based on factors other than sex.

Judgment will be entered for defendant dismissing the complaint.

---

1. Additionally, defendant points out, the third shift worked less desirable hours. However, this element appears to have been taken care of by the fact that the men received an additional allowance over and above the basic rate under the company's regularly established differential for night work.