George P. SHULTZ, Secretary of Labor,
United States Department of Labor,
Plaintiff,

v.

CORNING GLASS WORKS, a
Corporation, Defendant.

Civ. No. 1967–29.

United States District Court,
W. D. New York.

July 10, 1970.

Francis V. LaRuffa, Chief Trial Attorney, and Isabelle R. Cappello, Deputy Counsel for Regional Litigation, U. S. Department of Labor, for plaintiff.

Reed, Smith, Shaw & McClay, Pittsburgh, Pa. (John G. Wayman and Scott F. Zimmerman, Pittsburgh, Pa., of counsel), for defendant.

CURTIN, District Judge.

The Secretary of Labor commenced this action under the provisions of Section 17 of the Fair Labor Standards Act (29 U.S.C. § 217) to enjoin violations of Section 6(d) [29 U.S.C. § 206(d)] of the Act, and to restrain any withholding of payment of wages found by the court to be due to employees under the Act.

The plaintiff, George P. Shultz, Secretary of Labor, sues on behalf of all Class C, Class B, TV, and General TV inspectors working during periods pertinent in this lawsuit. Class B inspectors and Class C inspectors perform their functions in A Factory and in B & C Factory [also referred to herein as B Factory]. TV inspectors and General TV inspectors function in the Pressware plant.

This dispute arose because of the higher base wage rates paid to inspectors working on the steady night shift who allegedly perform work equal to that performed by inspectors on the day and afternoon shifts. Prior to June 1, 1966, except during World War II, only female inspectors worked in the disputed

jobs on the day and afternoon shifts, and only male inspectors worked on the steady night shift.

The defendant's employees represented by the plaintiff include both male and female inspectors in the various job categories. Those male inspectors who did inspection work on the day and afternoon shifts after June 11, 1964, the effective date of the Equal Pay Act, are damaged monetarily if the violation charged is proven because, absent a violation, the base rate for the day and afternoon shifts would equal the higher base rate paid at night.

Section 6(d), commonly known as the Equal Pay Act, was enacted on June 10, 1963, to be effective one year thereafter. Section 6(d)(1) provides:

"No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex: *Provided,* That an employer who is paying a wage rate differential in violation of this subsection shall not, in order to comply with the provisions of this subsection, reduce the wage rate of any employee."

■ To carry its burden of proof, the plaintiff must establish by a fair preponderance of the evidence these elements:

(1) The disputed jobs entail equal work, that is, the performance of these jobs, under similar working conditions, require equal skill, effort, and responsibility;

(2) Within the same establishment, the defendant pays employees doing equal work a different wage rate;

(3) The different wage rates are paid on account of sex.

■ The four exceptions to the Act have been held to be affirmative defenses which must be pleaded and proven by a defendant-employer. Wirtz v. Basic, Inc., 256 F.Supp. 786 (D.Nev.1966). Finally, an employer may not decrease any employee's pay rate to come in conformity with the Act.

In its original answer, the defendant denied that the work performed by the men and women involved in this lawsuit was equal. After the trial, the defendant moved, pursuant to Rule 15 of the Federal Rules of Civil Procedure, for an order permitting it to amend its answer to conform to the evidence. The proposed amendments are: (1) "The payments made to steady night shift inspectors were and are based upon a factor other than sex;" (2) "To the extent that the complaint states a claim prior to November 1, 1964, it is barred by the statute of limitations." Defendant's motion to amend its answer is granted.

At the beginning of the trial, the parties stipulated that the statute of limitations barred all claims arising prior to November 1, 1964. Accordingly, any award for back pay should be computed commencing on November 1, 1964.

The court has considered the extensive memoranda of law submitted by the parties. What follows constitutes this court's findings of fact and conclusions of law.

### ESTABLISHMENT

All three plants are separate, making different products. A Factory is engaged primarily in the production of pyrex products, B & C Factory in the production of optical products, and the Pressware plant in the production of television products.

A Factory and B & C Factory share an office building, are located back to back, and are connected by passageways. The Pressware plant is about one-half mile away from the other two.

Each plant is an independent manufacturing unit, having its own management and engineering staff and a separate payroll department.

A central employment office where all prospective employees make their original applications services all Corning area plants. As a particular plant needs new workers, a final pre-employment interview is conducted at the separate personnel office of the plant, where the decision is made to accept or reject the applicant for employment. After employment, an employee, by exercising his seniority rights, may transfer from one plant to another. However, a transfer from A Factory or B Factory to Pressware, or back to A Factory or B Factory from Pressware, is unusual since Class C and Class B inspectors work only in A Factory or B Factory, and TV and General TV inspectors work only in the Pressware plant.

Most employees at Corning, including the inspectors, are represented by the American Flint Glass Workers of North America, Local 1000. One collective bargaining agreement covers all Corning area plants. All payroll checks are written on a computer on information supplied by each plant.

■ The court finds that A Factory and B & C Factory constitute one establishment, and that the Pressware plant constitutes a separate establishment within the meaning of the Equal Pay Act. The reasons for this holding are that Pressware is separated from the other two plants, and because the inspectors do not transfer back and forth between the Pressware plant and the other two plants. Phillips, Inc. v. Walling, 324 U.S. 490, 65 S.Ct. 807, 89 L.Ed. 1095 (1944); Mitchell v. Bekins Van & Storage Company, 325 U.S. 1027, 77 S.Ct. 593, 1 L.Ed.2d 589 (1957), 29 CFR 800.-108.

## HISTORY

Steady night shift inspection jobs were added to existing rotating day and afternoon shift inspection jobs some time between 1925 and 1930, when the introduction of automatic production equipment made it necessary to inspect wares on three shifts. At that time, New York State law prohibited the employment of women between the hours of 10:00 P.M. and 6:00 A.M.[1] The defendant did not pay additional wages in 1930 as a shift differential. However, in order to obtain male employees willing to perform what was regarded by the male employees as female work, the defendant had to pay the male employees a higher rate than it paid female employees who performed inspection work on the day and afternoon shifts. This higher base rate for steady night work was never paid for inspection work on the day and afternoon shifts until January 20, 1969, when the company and the union agreed to equalize base rates on all three shifts with payments retroactive to November, 1968.

Beginning in the early 30's, some inspectors at some stations on the steady night shift performed their own "utility work" which entailed, among other things, carrying heavy loads from the end of the lehr. Similar work on the day and afternoon shifts was performed by utility workers assigned to assist the female inspectors.

Because of manpower shortages during World War II, the defendant employed some women as steady night shift inspectors. These female night inspectors performed their own utility work, including the moving of boxes, the trucking away of ware and the positioning of skids and boxes adjacent to the inspection area. They received a higher

---

[1]. Law of March 30, 1927, ch. 453, § 172, [1927] N.Y.Laws; Law of April 28, 1930, ch. 868, § 172, [1930] N.Y.Laws (which carried forward, without change, the prohibition against night work by females).

rate of pay than the day and afternoon inspectors and the same rate paid to male night inspectors, if and when they performed all the work ordinarily required of a male night inspector.

After World War II, Corning returned to the prior practice of employing only males in the steady third shift inspection jobs.

In 1944, the American Flint Glass Workers Union of North America negotiated a collective bargaining agreement covering many production and maintenance employees of the defendant's plants located in Corning, New York. This contract covered the inspectors employed at A Factory, B & C Factory, and the Pressware plants, and it provided for a steady night shift wage differential as a premium for night work. This differential was applicable to inspectors as well as most other hourly employees of the defendant.

In addition to the steady night shift wage differential, this contract continued in effect the existing differential in base wage rate between the steady night shift inspectors and the rotating day and afternoon shift inspectors. Between the years 1944 and 1968, all collective bargaining agreements entered into by the defendant with the union have maintained simiilar wage differential structures with minor variations caused by negotiation of percentage rather than flat rate increases.

In 1953, New York State law was amended to provide, for the first time, that females over twenty-one years of age could work after midnight in factories operating multiple shifts, where the Industrial Commissioner found that satisfactory conditions exist and granted his approval.[2] Similar provisions of the law have remained in effect during all times pertinent in this lawsuit.[3]

There is no evidence offered by either side that the Industrial Commissioner ever granted permission to the defendant to employ females on the steady night shift prior to June 1, 1966. From the fact that women actually worked the night shift inspection jobs after June 1, 1966, the court infers that the defendant obtained the necessary permission from the Industrial Commissioner. Further, the defendant has failed to offer any explanation of what, if any, efforts were made to obtain this permission at an earlier date.

## MERGER OF RATE SCHEDULES

Prior to June 11, 1964, the defendant maintained separate "male" and "female" rate schedules. Under these separate rate schedules, male inspectors working the steady night shift were paid a higher hourly base rate than the rotating day and afternoon female inspectors who were in the same job category, performing work rated substantially equal by defendant's own job evaluation plans.

Effective June 11, 1964, the defendant merged these separate schedules into one revised rate schedule. This merger, however, preserved the differential in base rate between the men and the women inspectors on all three shifts. This difference was preserved by placing the women into a lower labor grade on the revised rate schedule with a lower rate of pay.

A comparison of the separate schedules and the single revised schedule illustrates how the difference was maintained.

The female rate schedule dated November 19, 1962 indicates that a Class C female inspector was in group 3 (i. e., the wage group of female employees whose jobs were evaluated between 215

2. Law of April 13, 1953, ch. 708, § 172, [1953] N.Y.Laws (which amended section 172 to allow, for the first time, night work for females upon approval by the Industrial Commissioner).

3. During the period pertinent in this lawsuit, New York Labor Law, Section 173

(3) (a) (1), effective October 1, 1963, carried forward the effect of the 1953 amendment allowing night work by females after the required approval. N.Y. Labor Law, McKinney's Consol.Laws, c. 31, § 173(3) (a) (1) (McKinney 1965).

and 235) and was paid $1.89 to $1.97½. On the merged rate schedule, Class C female inspectors were classified as "new group" 1, and their rate of pay was $1.97½.

The *male* rate schedule dated November 19, 1962 indicates that a Class C male inspector, working nights, was classified in wage group 2 (i. e., that group of male employees whose jobs were evaluated between 165 and 235) and was paid $1.99 to $2.13½. On the merged rate schedule, the former male rates were maintained by placing the Class C male inspector in "new group" 5, with rate range of $2.01½ to $2.13½.

The Class B inspectors and the General TV inspectors, male and female, were affected similarly by the merger of the rate schedules.

Therefore, the merger continued the historical difference in base hourly rates of the men and women inspectors working the three shifts. In the case of Class C and TV inspectors, the base rate differential between men and women inspectors was 16¢ an hour. For Class B and General TV inspectors, the hourly differential was 18¢. In the years after June 11, 1964, the hourly base rate differential was gradually increased.

## SENIORITY LISTS

Before June 1, 1966, defendant had maintained separate "male" and "female" seniority lists. In effect, these separate lists made it impossible for a female inspector to transfer into a steady night-time traditionally male inspection job.

Effective July, 1965, the Civil Rights Act mandated equal employment opportunities without regard to an employee's sex.[4] On May 31, 1966, the defendant abandoned its separate seniority lists, thus affording female inspectors an opportunity to take higher paid night shift inspection jobs as they became available. After June 1, 1966, a number of female employees availed themselves of the op-

portunity to use seniority to take the higher paying night shift inspection jobs. Of course, they also received the Corning-wide night-time differential provided by the collective bargaining agreement. Also since June, 1966, some men inspectors have taken day and afternoon inspection jobs with the reduced base hourly wage rate. This abandonment of the separate seniority lists was accomplished by mutual agreement between the union and defendant.

## EQUALITY OF WORK—JOB EVALUATION PLANS: ADMISSIBILITY AND ANALYSIS

In attempting to meet its burden of proving the equality of the disputed inspection jobs on all three shifts, the plaintiff has relied heavily on two job evaluation studies conducted by the defendant. These evaluation studies rate the disputed work equal on all three shifts.

In a pretrial statement analyzing the plaintiff's proposed exhibits and giving reasons for objections, which the court required the defendant to submit, no objection was made to Exhibits 34 to 41, and Exhibits 42 to 46 were objected to only on the grounds of relevancy and materiality. During the trial, the defendant objected only on the grounds of relevancy and materiality to the admission of plaintiff's Exhibits 34 to 46. In its post-trial memorandum, defendant for the first time raises additional objections to these exhibits, claiming that the records are hearsay, that they are not business records kept in the regular course of business, and that a proper foundation was not laid for their admissibility.

Since these grounds were not asserted definitely during the trial, the defendant has waived its right to object on these grounds. 2B Barron & Holtzoff, Federal Practice and Procedure, § 1021, at pp. 309–319 (C.A. Wright rev. 1961). If the defendant's objection had been

---

4. Civil Rights Act, 42 U.S.C.A. § 2000e-2 (1970) (statute effective one year after July 2, 1964).

made clear at the time of trial, the plaintiff would have had an opportunity to clear up any deficiency which was present in the offer.

Furthermore, the purpose of Title 28, United States Code, Section 1732, the Federal Business Records Act, "is to permit the introduction into evidence of reports in substitution for the actual testimony in court of the persons making the reports." United States v. New York Foreign Trade Zone Operators, 304 F.2d 792 (2d Cir. 1962). "The statute was designed to bring the realities of business and professional practice into the courtroom in usable form * * *" Korte v. New York, N. H. & H. R. R., 191 F.2d 86, 91 (2d Cir. 1951).

The records admitted were made and kept in the regular course of business of the defendant by trained observers following guidelines published by the defendant after a careful study had been made of the problems involved in evaluating the jobs. The job descriptions and evaluations were regularly used by the defendant in the course of its business and they were all prepared before the present litigation began.

Considering the purpose of the Federal Business Records Act, the reliability of these records was well established. Thus, defendant's objections to the admission of these exhibits is overruled.

It is necessary for the court to examine these studies to determine if the plaintiff has met its burden of proving equality of work.

The Stevenson, Jordan & Harrison Job Evaluation Plan [hereinafter referred to as the SJ&H Plan] was installed in 1946 and, according to the defendant, remained in effect until January 20, 1969. This evaluation plan measured skill, responsibility, and working conditions in evaluating the work performed in different job classifications. The defendant claims it was deficient since it did not take into account the amount of effort required in the performance of the jobs, or the time of the day the work was performed.

Further, defendant claims that the SJ&H Plan was never used to set wage rates because all base wage rates, including the separate male and female wage curves and the merged base rates, were the result of negotiation between the company and the union. In sum, the defendant contends, a higher base rate was negotiated for the male inspectors on the steady night shift, in spite of the fact that the SJ&H Plan evaluated the work done under the same inspection classification equal on all three shifts.

The court is in accord with defendant's position that plaintiff cannot satisfy its burden of proof by relying on the descriptions used and the evaluation points determined in the SJ&H Plan. The Equal Pay Act requires that, for jobs to be equal, their performance must require "equal skill, effort, and responsibility," and must be performed "under similar working conditions, * * *" The SJ&H Plan did not measure effort. Therefore, the descriptions and evaluations prepared under this plan are insufficient alone to satisfy plaintiff's burden of proving the equality of the work.

The plaintiff also relies upon the Corning Glass Works Job Evaluation Plan [hereinafter referred to as CGW Plan], and the descriptions of the jobs made under this plan to satisfy its burden of proof.

The CGW Plan was developed over the years commencing in 1957. The CGW Evaluation Manual states that the purpose of the plan was "to establish equitable differences in pay between jobs based on job requirements, and further explains that "through the use of this system, equitable relationships will be established in terms of job evaluation points. When these points are applied to local wage curves, they will establish the rate range for any given job at that location." The CGW Plan measured effort, skill, responsibility, and working conditions. Like the SJ&H Plan, the CGW Plan does not take into account the time of day a particular job is performed.

The CGW Plan was first installed to establish wages in a branch plant in 1960 and, since that time, it has been installed at 24 branch plants. There was discussion between the company and the union in 1962 concerning its use at Corning. According to the defendant, this offer to use the plan in Corning was rejected by the union in 1962 and on five subsequent occasions. The reasons for the rejection by the union are unknown to the court. Nevertheless, in January, 1969, Corning and the union agreed that the CGW Plan would be the official job evaluation plan at Corning, with rates effective November, 1968.

Although the plan was not in effect until the latter part of 1968, the Industrial Engineering Department at Corning prepared descriptions of several of the jobs in question in this lawsuit and evaluated each of them in accordance with the CGW Plan during 1963 and early 1964. Under this plan, the work in most of the job classifications disputed in this lawsuit was evaluated as equal on all three shifts.

Defendant argues that plaintiff's use of the CGW Plan evaluation points and job descriptions also fails to satisfy plaintiff's burden of proof. It is defendant's claim that the job descriptions under this plan describe what an inspector is supposed to do, but do not actually describe the work he actually performs. Further, defendant argues that the CGW description and evaluation points are irrelevant prior to January, 1969 when the plan went into effect.

The testimony during the trial and the procedures set forth in the CGW "Guide for Describing And Evaluating" indicate that the first step in the evaluation procedure is an on-the-job observation of the work actually being performed in a certain job classification. Job analysts, together with the employees actually performing the work and their superiors, collaborate in describing the work actually performed. Once this job description is finally drafted, it serves as the basis for job evaluation.

Under this plan, plant supervisors are responsible to report to the job analysts any significant changes in the work actually performed which might affect the originally drafted job description. Obviously, this requirement insures that job descriptions and the resulting job evaluations will be kept as current as possible and reflect the work that is actually being done within a job classification.

The court notes that no CGW job description of TV inspectors in Pressware was admitted in evidence. Further, the product line in Pressware changed in late 1968 resulting in a change in the CGW job descriptions that had been prepared for this plant (i. e., General TV Inspector). Mr. Edward Noble, Manager of Job Evaluation at Corning, testified that the CGW description had been revised, but that this particular job still required equal work on all three shifts.

The defendant also argues that plaintiff may not rely on the CGW job descriptions to show that the jobs in question are equal under the Act, since the descriptions do not reflect the fact that some male inspectors on the night shift do their own utility work, while some female inspectors on the rotating day and afternoon shifts are assisted by utility workers. Utility workers move inspected material off the lehr, clean up around the inspection stations, pack ware and move it from the inspection area. They are required to exert more manual effort than the inspectors, but their jobs are evaluated at points lower than the inspectors in visual effort, skill, and responsibility.

Specifically, during the years 1964 to 1968, utility workers were assigned to help female day and afternoon inspectors in B Factory when Flameware was being manufactured. Flameware is a pyrex product which is manufactured from 12 to 20 weeks a year. During the years from November, 1964 to June, 1968, 120 female day and afternoon Class C and Class B inspectors worked in B Factory on Flameware. During these same years, as many as 10 and as

few as 4 men had been assigned to perform this utility work during a particular year.

The analyst was instructed under the CGW Evaluation Manual to "cover the work normally performed on a regular basis and those duties which require special skills but are performed only occasionally." The analyst was further instructed that "it is not necessary for the description to include every task performed in the past or likely to be performed in the future."

The performance of utility tasks by some inspectors does not make the jobs unequal. In describing and evaluating the inspection jobs, defendant's analysts considered the utility work of so little consequence that these tasks were not included in the job descriptions of any of the inspectors. For each job classified, the job descriptions are the same on all shifts regardless of whether the work is performed by men or women. Since June 1, 1966, women have been permitted to work on the steady night shift at the same wage rate as the male night inspectors. The conclusion that utility work by inspectors was incidental or "performed only occasionally" is borne out by the fact that defendant has always paid male steady night inspectors at the same rate, whether they performed utility work or not.

Because of these facts, the court concludes that the defendant over-emphasized the role of utility workers in assisting the women during the day and afternoon shifts, and put too much emphasis on the extra work done by the male inspectors during the night shift.

Furthermore, there is other evidence in the case to show the equality of the work. Although he qualified his testimony, Edward W. Noble, manager of job evaluation for the defendant, testified: "There is very little difference from shift to shift," in describing the jobs in question. He did not know what each and every individual did, but he was familiar with the jobs from occasional personal observation and from reports made by job analysts and plant managers who were instructed to report any significant job changes.

The court is satisfied that the most accurate description of what the inspectors actually did is provided by the thoughtful description of the job analyst made under the supervision of the job evaluation manager, in cooperation with the employee himself and his plant manager. Another reason for their reliability is that these studies were made before there was any hint of litigation.

To hear testimony from a fair sampling of the employees occupying all the disputed jobs on all shifts during the relevant time period would have consumed, in the court's best estimate, many trial days. And there is no reason to believe that the descriptions which the court could have interpolated from all this testimony would reflect the work actually done in any better fashion than the job descriptions drafted under the CGW Plan.

■ The defendant also argues that the CGW job evaluation is unreliable under Equal Pay Act standards because the time of day the work is performed is not considered in determining the relative similarity in working conditions. However, the defendant pays a Corning-wide differential for night work. In Wirtz v. Dennison Manufacturing Co., 265 F.Supp. 787, fn. 1 (D.Mass.1967), the court said that "this element [working less desirable night shift] appears to have been taken care of by the fact that the men received an additional allowance over and above the basic rate under the company's regularly established differential for night work." This court is in accord that a differential such as the Corning-wide night differential adequately compensates employees for working undesirable times of day and, therefore, rejects the defendant's contention in this respect.

Finally, in a case brought under the overtime provisions of the Fair Labor Standards Act, the Supreme Court pointed out that "the employer * * * is in [a] position to know and to pro-

duce the most probative facts concerning the nature and amount of work performed." Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 687, 66 S.Ct. 1187, 1192, 90 L.Ed. 1515 (1946). Here as in *Anderson*, the defendant is in the best position to offer evidence and to explain why the results of its own job evaluation study should not be considered in determining the equality of work on all three shifts. The court concludes that the defendant has failed to offer any persuasive reason why the CGW descriptions. and evaluation points should not be relied upon by the court.

■ Therefore, on all the testimony and exhibits before the court, the court concludes that the CGW job descriptions used for the jobs disputed in this lawsuit reflect the work that is actually being done within the meaning of the Equal Pay Act and the regulations promulgated thereunder. As a result of this, the court further concludes that the evaluation points assigned to the jobs disputed in this case are a valid reflection of the equality of the work performed.

Therefore, the court concludes that the work performed by the inspectors involved in this lawsuit and evaluated under the CGW Plan is equal on all three shifts and has been so since November, 1964, within the meaning of the provisions of the Equal Pay Act.

### AFFIRMATIVE DEFENSE

The defendant, as one of its affirmative defenses, claims that the higher base rate paid steady night shift inspectors is "a differential based on any other factor other than sex." The defendant traces the history of the higher base rate on the steady night shift from its creation in 1930 to its final elimination in January, 1969. The circumstances causing the creation and perpetuation of the higher rate until 1969, the defendant argues, explains that the higher rate was a result of a "factor other than sex."

The creation of the night shift inspection jobs was brought about by the advent of automation in the glass manufacturing business. Inspection work had to be done on all three shifts.

In 1930, women had filled most, if not all, of the inspection jobs on the day and afternoon shifts. New York law did not permit women to occupy night shift jobs. As the defendant explains it, men were less than enthusiastic in accepting steady night shift inspection work which they regarded as "women's work."

In addition, the men who were to fill the newly created night inspection positions had been working in the blowing room where they received incentive pay. With their average incentive pay added to their regular wage, they could earn more than the company was paying for inspection work on the day and afternoon shifts.

Because of these factors, it was necessary to pay men a higher rate than women for the night inspection work.

This "differential" in base rate was continued as a result of negotiation until January, 1969, even though the first union contract in 1944 provided for a Corning-wide night shift differential. Prior to June 1, 1966, only male inspectors worked the night shift and received this differential in base rate, plus a night shift differential.

The night shift differential was originally 5¢ an hour and reached 12¢ an hour in 1958. The steady night shift differential represents compensation for the undesirable hours of this shift, which begins at 10:00 P.M., 11:00 P.M., or midnight.

For purposes of this litigation, the defendant has called the differential in hourly base pay a "supplemental escalating shift differential." This term is not used in the agreements and defendant's supervisors who testified had never heard of it and did not understand what it meant.

Citing the interaction between the company and the union, the fact that New York law prohibited night work by women for a long period of time, and the original reasons why a differential

in base rate was necessary, the defendant attempts to justify the higher night shift base rate paid to men after June 11, 1964. The court, however, is not persuaded that paying a higher steady night shift rate, a "supplemental escalating shift differential," is justifiable after the effective date of the Equal Pay Act.

The Act was passed in June, 1963 to be effective with respect to defendant's employees in June, 1964. Thus, the defendant had a full year to implement compliance. As of 1953, New York State had lifted its absolute ban on night work by women. As of that year, women could have occupied night work positions if approval by the Industrial Commissioner was sought and obtained. And, although the original basis for the higher base rate on the steady night shift may have been reasonable in 1930, this higher rate could not, in the court's view, be legally maintained under circumstances in this case after the effective date of the Equal Pay Act.

Therefore, the defendant has failed to carry its burden of establishing, by a fair preponderance of the evidence, that the higher steady night shift differential was based on "any other factor other than sex."

## SUMMARY

The court concludes that the work performed by the Class C and Class B inspectors in A Factory and B Factory and the work performed by the General TV inspectors in Pressware was equal on all three shifts from November 1, 1964 until January, 1969, and that the higher base rate paid the steady night shift inspectors was maintained after June 11, 1964 on account of sex, in violation of the Equal Pay Act. The court further concludes that the effect of this violation persisted after June 1, 1966. Finally, the court concludes that the higher base rate paid night inspectors was not based on any other factor other than sex.

At the trial, the court deferred consideration of the amount of wages allegedly due the day and afternoon inspectors involved in this case. In light of the above findings of fact and conclusions of law, the defendant is restrained from withholding the payment of wages due for the period from November 1, 1964 to November, 1968, when the inspection base rates were equalized for all three shifts by the January 20, 1969 agreement.

The "supplemental escalating shift differential" in base rate shall be the basis for computing the wages due the Class C and Class B inspectors in A and B Factories and the General TV inspectors in Pressware. There shall be no award for TV inspectors in Pressware.

The parties shall attempt to agree upon the correct amount due for each employee affected by this decision. If the parties cannot agree on the amount of the judgment within a period of sixty days, or such further time granted by order of the court, then the plaintiff shall move on notice for an accounting by a Master to be appointed by the court.

The plaintiff may at any time renew his application for the issuance of further injunctive relief which may be equitable under the circumstances of this case. Presently, the court has refrained from issuing such further injunction because the inspection rates on all shifts have been equalized by the January 20, 1969 agreement.

So ordered.