James D. HODGSON, Secretary of Labor, United States Department of Labor [Successor to George P. Shultz, Resigned], Plaintiff,

v.

CORNING GLASS WORKS, a Corporation, Defendant.

Civ. 1967–29.

United States District Court,
W. D. New York.

Aug. 3, 1971.

Francis V. LaRuffa, Regional Sol., and Isabelle R. Cappello, Asst. Counsel for Trial Litigation, United States Dept. of Labor, for plaintiff.

Reed, Smith, Shaw & McClay, Pittsburgh, Pa. (John G. Wayman and Scott F. Zimmerman, Pittsburgh, Pa., of counsel), for defendant.

CURTIN, District Judge.

Plaintiff brought this suit under the provisions of Section 17 of the Fair Labor Standards Act (29 U.S.C. § 217) to enjoin violation of Section 6(d) of the Act [29 U.S.C. § 206(d)], and to restrain the withholding of payment of wages found by the court to be due to defendant's employees under the Act.

After a trial, this court filed a decision on July 10, 1970,[1] ruling that the work of the Class C, Class B, and General TV inspectors was equal on all shifts within the meaning of the Act, that the payment of a lower rate to the day and afternoon shift inspectors was sex-based and illegal, and that men as well as women were damaged monetarily when, after June 1, 1966, men worked at the previously all-female day and afternoon inspector jobs at a reduced base hourly wage rate. During that trial, defendant described the sum paid to night shift workers which was in addition to the regular night shift differential paid to all night workers as a "supplemental escalating shift differential." The court ordered that restitution be paid in that amount to the employees affected from November 1, 1964 until the end of November, 1968. Injunctive relief after that date was denied because, at the time of filing that decision, the court was of the opinion that the rates of all inspectors had been equalized on all shifts by a collective bargaining agreement entered into between the defendant and the Union on January 4, 1969.[2]

On July 17, 1970, plaintiff promptly moved to amend the findings of the court on the ground that the inspection rates on all shifts had not been equalized by the collective bargaining agreement.[3] To determine the impact of this agreement upon the wages paid to men and women inspectors on the three shifts, further extensive interrogatories and requests for admissions were filed and answered. In addition, on May 10, 1971, the court heard further testimony. The following constitutes the court's amended and supplemental findings of fact and conclusions of law.

Plaintiff and defendant are generally in agreement about the facts, but sharply dispute the conclusion which the court should draw from these facts. After considering the evidence presented, it is clear now that the court's prior decision that the January, 1969 agreement equalized the rate paid on all shifts to the inspection jobs after November, 1968 was in error.

During November and December, 1968, defendant and Local 1000 of the American Flint Glass Workers Union of North America negotiated a new collective bargaining agreement which was entered into on January 4, 1969. The agreement provided for certain retroactive wage boosts effective in November, 1969. The parties agreed that the Corning Glass Works Job Evaluation Plan, which the court relied upon in its original decision,

---

1. Shultz v. Corning Glass Works, 319 F. Supp. 1161 (W.D.N.Y.1970).

2. *Id.* at 1171.

3. Since July 10, 1970, other motions were also presented to the court. On December 2, 1970, the defendant's motion pursuant to Rule 19 of the Federal Rules of Civil Procedure to add the local and international unions as defendant parties was denied. A motion by plaintiff to include TV inspectors in the award was similarly denied.

would become effective on January 20, 1969.

Because the parties are not in dispute about the terms of the agreement or the wages which will be paid as a result of it, it is not necessary to detail the complicated formula used by the parties to set the rates, but, to understand the argument, it is important to summarize the results of the agreement.[4]

The Corning Glass Works Evaluation Plan rated the inspection jobs at issue in relation to the other jobs in the defendant's plant in a fair, non-discriminatory manner not based upon sex. It abolished the separate wage rates for day, afternoon, and night shift inspectors, increased the rate of all inspector jobs, day and night, so that the resulting wage was the same in all three shifts. Further provisions in the agreement, however, resulted in the payment of a higher rate at night to every person employed before January 20, 1969. Because of this "red circle" provision in the agreement, all Class C, Class B, and General TV inspectors (until this job was discontinued in December, 1969) working on the steady night shift have continued to receive a higher base wage rate—in addition to the plantwide night shift differential—than their counterparts of comparable seniority working on the day or afternoon shifts. Men or women may work the night shift but, when they transfer to the day or afternoon shifts, they receive less pay. This "red circle" or "protected" rate will not be paid to employees hired after January 20, 1969. However, up to May 10, 1971, the date of the hearing, no one hired after January 20, 1969 had worked at one of the night inspection jobs. It will be some time before the "red circle" rate will be phased out, because there are about 500 employees currently on layoff who must be offered an inspection job before it can be offered to a new employee.

The Company claims that the "red circle" rate was needed because of a policy to protect the rate of a senior employee when his job is reclassified at a lower rate. The Company specifically referred to that section of the agreement which provides that, when "job evaluation * * * results in wage brackets lower than prevailing rates then paid for the job, it is not the intention of the Company to reduce the prevailing base rates of employees currently working on

---

4. Defendant pays the following rates to employees employed on or prior to January 20, 1969 who work as Class B and Class C inspectors:

| | BASE RATE RESULTING FROM AGREEMENT OF | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | 11/1/67 through 1/5/69 | 1/4/69 through 11/2/69 | 11/3/69 through 1/4/70 | 1/5/70 through 11/1/70 | 11/2/70 through 1/3/71 | 1/4/71 through Present |
| Class B, night shift | $2.575 | $2.80 | $2.92 | $2.95 | $3.07 | $3.10 |
| Class B, day and afternoon shifts | 2.37 | 2.68 | 2.80 | 2.83 | 2.945 | 2.975 |
| Differential | .205 | .12 | .12 | .12 | .125 | .125 |
| Class C, night shift | 2.46 | 2.68 | 2.80 | 2.83 | 2.945 | 2.975 |
| Class C, day and afternoon shifts | 2.29 | 2.64 | 2.76 | 2.79 | 2.90 | 2.93 |
| Differential | .17 | .04 | .04 | .04 | .045 | .045 |

The agreement provided that an added retroactive sum payment be made for the period between November 4, 1968 and January 6, 1969. The sum was based on the rate of the employee's job on January 6, 1969. The arrangement was arbitrary and temporary. Plaintiff does not request that a recomputation be made for this period, and none is ordered by the court.

such jobs."[5] A complicated formula in the agreement put this general statement into practical effect, with the result that the night inspection job previously receiving a "supplemental escalating shift differential" now received a "red circle" or "protected" rate. The amount of the "red circle" rate is smaller than the "supplemental escalating shift differential" but the result of this plan was to continue the prior practice under another name.

In its original decision, the court ruled that, from June, 1964 continuing through June 1, 1966, when women first worked on the night inspection jobs, until November, 1968, day and afternoon inspectors were entitled to be paid the "supplemental escalating shift differential."[6]

If the day and afternoon inspectors had been paid this amount before November, 1968, in January, 1969 when the new agreement was entered into, the day and afternoon inspectors would have received the benefit of the "red circle" rate in the same way that the night shift inspectors did. To state it in another fashion, if defendant had been in compliance with the Equal Pay Act on June 11, 1964, all inspectors would have been paid at the same rate in January, 1969, and all would have received the same increase when the agreement went into effect.

■ Defendant insists that seniority and not sex discrimination is the reason for the extra pay. Defendant alludes to the fact that both men and women have received the "red circle" protection; that, when women who have been employed before January 20, 1969 work the night shift, they receive the "protected" rate and, when men work the day shift, they work at the reduced rate.[7] Furthermore, defendant contends that the formula for the "red circle" protection depended upon the payment made to inspectors immediately before the agreement was reached. Since both men and women worked as night inspectors from June, 1966, the defendant's argument is that the "red circle" rate is derived from a wage paid to women as well as men.[8]

However, the court has already found that the payment of the "supplemental escalating shift differential" during the period June, 1966 to November, 1968 was sex based and a violation of the Act. The rates paid during that period were the result of a longstanding practice to pay a lower rate to female inspectors who, for many years, worked only the day or afternoon shifts.[9] During the hearing, defendant admitted that there is an historical connection between the "red circle" rate and the prior "supplemental escalating shift differential."

■ It is appropriate to apply the principles growing out of the cases arising under Title VII of the Civil Rights Act of 1964 [42 U.S.C. § 2000e-2] to Equal Pay Act cases, since the purpose of both Acts is to eliminate employment

---

5. Agreement, Corning Glass Works and American Flint Glass Workers' Union of North America, A.F.L.–C.I.O., January 4, 1969, Article XV, Section 2.

6. 319 F.Supp. at 1171.

7. There is no question that women as well as men have the opportunity to work at night. Between January 20, 1969 and December 27, 1970, 140 males and 274 females filled 524 vacancies on Inspector Class B jobs on the day and afternoon shifts in A and B Factories. Similarly, 72 males and 80 females filled 179 vacancies on the steady night shift. In the Pressware Plant, 56 males and 158 females filled 380 General TV Inspector vacancies on the day and afternoon shifts, while on the steady night shift 39 males and 46 females filled 114 vacancies.

8. Defendant further argues that the January, 1969 agreement does not violate the Act because no rates were reduced, that, instead, the rates of all inspectors were increased. For example, an employee who was performing any of the three inspection jobs on the steady night shift under the wage rate in effect prior to January 4, 1969, and who transferred to the day shift under the wage rate in effect after January 4, 1969 received a wage increase, not a decrease, as a result of the agreement.

This argument is obviously without merit. To find out whether rates are discriminatory, they must be compared on the same day, not on the day before and the day after an increase.

9. 319 F.Supp. at 1164–1165.

discrimination. Shultz v. Wheaton Glass Co., 421 F.2d 259, 266 (3d Cir.), cert. denied, 398 U.S. 905, 90 S.Ct. 1696, 26 L. Ed.2d 64 (1970).

█ Assuming that the formula for payment of wages after January 20, 1969 is a neutral employment practice, one to protect the rate paid to senior employees, nevertheless, if the result of this formula perpetuates past discrimination, it will not be permitted. In Griggs v. Duke Power Co., 401 U.S. 424, at page 430, 91 S.Ct. 849, at page 853, 28 L.Ed.2d 158 (1971), a Title VII action, the Supreme Court said:

"Under the Act, practices, procedures, or tests neutral on their face, and even neutral in terms of intent, cannot be maintained if they operate to 'freeze' the status quo of prior discriminatory employment practices."

See also, United States v. Bethlehem Steel Co. (2d Cir.), 446 F.2d 652, decided June 21, 1971. In that action under Title VII of the Civil Rights Act, the court ordered rate retention for a group which had been discriminated against in employment opportunities. The court explained that it did so "so that the effects of past discrimination would not be perpetuated."

The court finds that, in this case, the "red circle" rate paid to night shift inspectors perpetuates the discrimination of the "supplemental escalating shift differential." The "red circle" rate is not a valid "red circle" rate under the Equal Pay Act. 29 C.F.R. § 800.146.

In order to eliminate the discriminatory rate paid to day and afternoon shift inspectors, the Company shall pay the "red circle" rate to them as well as to night shift inspectors. Defendant is restrained from withholding the payment of wages due for the period from November 1, 1964 [10] until the date it equalizes the rate paid to the various inspectors. The basis for computing the wages due shall be equivalent to the "supplemental escalating shift differential" and the "red circle" differential, depending upon the time period involved. The parties shall attempt to agree upon the correct amount due each employee affected by this decision. If they cannot agree upon the amount of the judgment within a period of sixty days, then the plaintiff is directed to move promptly, on notice, for an accounting by a Master to be appointed by the court. At the same time, the parties are directed to attempt to agree upon the manner of distribution of the award to the employees.

█ In the court's original decision, the plaintiff's application for an injunction pursuant to Section 17 of the Fair Labor Standards Act, restraining future violations of the Act was denied with leave to renew. The court is now satisfied that the plaintiff is entitled to this relief. The defendant has been in violation since June 11, 1964. Since January, 1969 when the Company entered into the new agreement, it continued to pay the past discriminatory rate. The Company admits that a similar plan for the payment of inspectors was in force in at least two other plants and, in at least ten plants of the twenty-six, up to May, 1964 it continued to have separate male and female rate schedules. Furthermore, the present collective bargaining agreement at the Corning plant expires on January 20, 1972. Whatever new agreement is entered into, it is important that the negotiations be carried out with the understanding that future violations of the Act may be the subject of contempt proceedings.

Under these circumstances, an injunction should issue for the purpose of the Act is to "correct a continuing offense against the public interest," not simply "to collect a debt owed by an employer to his employee." Wirtz v. Jones, 340 F.2d 901, 904 (5th Cir. 1965). The injunction merely directs what the employer is required to do by law. It places no additional burden on the Company, but it relieves the heavy burden placed upon the Department of Labor to conduct a

10. The parties agree that the statute of limitations bars relief prior to November 1, 1964. *Id.* at 1163.

widespread investigation of defendant's operation. See Wirtz v. Harper Buffing Mach. Co., 280 F.Supp. 376, 382 (D.Conn. 1968), aff'd without opinion, 2d Cir. September 17, 1968, Dkt. No. 32167; Walling v. Brooklyn Braid Co., 152 F.2d 938 (2d Cir. 1945); and Hodgson v. Ricky Fashions, Inc., 434 F.2d 1261 (5th Cir. 1970).

In addition, to carry out the purpose of the Act, the injunction issued must be company-wide. Since the discriminatory practice was allowed to continue at the Corning plant, the court believes that, in other plants not under the pressure of investigation or litigation, the Company would not strenuously endeavor to correct similar discriminatory practices. Beneficial Finance Co. of Wisconsin v. Wirtz, 346 F.2d 340 (7th Cir. 1965). The court directs that the defendant Company at Corning and at all branch plants, except the branch plant at Wellsboro, Pennsylvania where an action has been filed and a trial is likely in the near future, its officers, employees, and those in active concert with them are enjoined from future violations of the Act.

Interest shall be paid on the amounts withheld at the rate of 6% from the median date of employment. In Hodgson v. American Can Co., 440 F. 2d 916, 922 (8th Cir. 1971), the court explained the reason for the award of interest:

"* * * In the absence of an unequivocal prohibition of interest, and where the statute imposes a money obligation, the power of the court to award interest is dependent on an appraisal of the congressional purpose of imposing the obligation and on the relative equities of the parties. Rodgers v. United States, 332 U.S. 371, 68 S.Ct. 5, 92 L.Ed. 3 (1947). Clearly the award of back wages under the Fair Labor Standards Act is remedial in nature. 29 U.S.C. § 202(b), * *. The purpose of the award is to compensate the employees for the loss sustained because of the wrongful withholding of wages. While the good faith of the employer is one of many factors to be considered, '[t]o make such employees whole, the provision for the payment of interest for the time the back pay was wrongfully withheld from them is only equitable.' * * *

From the inception of the discrimination, American Can was unjustly enriched and the female employees were damaged. During the entire period American Can has had the use of the money, and therefore equity and justice requires payment by way of interest for its use. The interest should be allowed from the dates of the underpayment. * * *"

Similar considerations require the awarding of interest in this case.

So ordered.